[Cite as *State v. Hall*, 2022-Ohio-1147.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-12-087 |
| | : | O P I N I O N |
| - vs - | | 4/4/2022 |
| | : | |
| TIMOTHY GLENN HALL, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 19CR35473


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Flanagan, Lieberman Hoffman & Swaim, and Richard Hempfling, for appellant.


**S. POWELL, P.J.**

{¶ 1} Appellant, Timothy Glenn Hall, appeals his conviction in the Warren County Court of Common Pleas after a jury found him guilty of four counts of rape and three counts of sexual battery that he perpetrated against his then preteen and teenaged stepdaughter, E.A., in 1995, 1997, and 1998. For the reasons outlined below, we affirm Hall's conviction.

**Introduction**

{¶ 2} On July 1, 2019, the Warren County Grand Jury returned a multi-count indictment charging Hall with ten counts of first-degree felony rape in violation of R.C. 2907.02(A)(1)(b), 2907.02(A)(1)(c), or 2907.02(A)(2). This multi-count indictment also charged Hall with seven counts of third-degree felony sexual battery in violation of R.C. 2907.03(A)(5). The charges arose after it was alleged Hall had engaged in "sexual conduct" with two minor children, his adopted daughter, A.Z., and his stepdaughter, E.A., during different periods of the 1990s.

**The Changing Definition of "Sexual Conduct" Under R.C. 2907.01(A)**

{¶ 3} Throughout its history, and as relevant here, the Ohio Revised Code has provided three different definitions of the term "sexual conduct" under R.C. 2907.01(A). Effective January 1, 1974, the term "sexual conduct" was initially defined to mean:

> vaginal intercourse between a male and female, anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 4} However, effective September 3, 1996, the term "sexual conduct" was defined to mean:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; *and the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another*. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

(Emphasis added.)[1]

{¶ 5} The "sexual conduct" definition was changed in 1996 so that the offense of felonious sexual penetration found under R.C. 2907.12 would merge into the offense of

---

1. The language set forth in italics was added to the "sexual conduct" definition effective September 3, 1996.

rape under R.C. 2907.02. *See Doe v. Leis*, 1st Dist. Hamilton No. C-050591, 2006-Ohio-4507, ¶ 12 (noting that after September 3, 1996 "conduct that would formerly have constituted felonious sexual penetration was defined as 'sexual conduct' under R.C. 2907.01[A] and became prohibited conduct under the rape statute"); *State v. Bolling*, 2nd Dist. Montgomery No. 20225, 2005-Ohio-2509, ¶ 28 (noting that the felonious sexual penetration statute found under the former R.C. 2907.12 "was repealed effective September 3, 1996, and the former conduct constituting [the offense of felonious sexual penetration] was redefined as 'sexual conduct' and included in the new and current rape statute"); and *State v. Rowland*, 10th Dist. Franklin No. 01AP-368, 2001 Ohio App. LEXIS 4306, *9, fn. 2 (Sept. 25, 2001) (noting that the purpose and effect of redefining the term "sexual conduct" was to "specifically clarify that what formerly was defined as 'felonious sexual penetration' [was] now rape").

{¶ 6} The definition of "sexual conduct" was changed again effective March 10, 1998 to mean:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, *without privilege to do so*, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

(Emphasis added.)[2]

{¶ 7} After March 10, 1998, there have been no additional changes to the "sexual conduct" definition in R.C. 2907.01(A) that are relevant to this appeal.

**Hall's Alleged Sexual Abuse of A.Z.**

{¶ 8} As originally charged, the indictment set forth eight charges related to Hall's

---

2. The language set forth in italics was added to the "sexual conduct" definition effective March 10, 1998.

alleged sexual abuse of his adopted daughter, A.Z., between July 1, 1991 through June 30, 1996. Those eight charges consisted of five counts of rape and three counts of sexual battery. One of those charges, Count 6, which alleged Hall had raped A.Z. between July 1, 1994 and June 30, 1996 in violation of R.C. 2907.02(A)(1)(c), was later nolled by the state prior to trial. Therefore, when this case ultimately went to trial in August of 2020, Hall faced the following seven charges related to his alleged sexual abuse of his adopted daughter, A.Z.

{¶ 9} Count 1 charged Hall with raping A.Z. between July 1, 1991 through June 30, 1993 in violation of R.C. 2907.02(A)(1)(b). Pursuant to that statute, no person shall engage in "sexual conduct" with another who is not the spouse of the offender when "[t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 10} Count 2 charged Hall with raping A.Z. between July 1, 1991 through June 30, 1993 in violation of R.C. 2907.02(A)(2). Pursuant to that statute, "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 11} Count 3 charged Hall with sexually battering A.Z. between July 1, 1991 through June 30, 1993 in violation of R.C. 2907.03(A)(5). Pursuant to that statute, no person shall engage in "sexual conduct" with another, not the spouse of the offender, when "[t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."

{¶ 12} Count 4 charged Hall with raping A.Z. between July 1, 1993 through June 30, 1995 in violation of R.C. 2907.02(A)(2), the same Revised Code section Hall was alleged to have violated in Count 2.

{¶ 13} Count 5 charged Hall with sexually battering A.Z. between July 1, 1993 and

- 4 -

June 30, 1995 in violation of R.C. 2907.03(A)(5), the same Revised Code section Hall was alleged to have violated in Count 3.

{¶ 14} Count 7 charged Hall with raping A.Z. between July 1, 1994 through June 30, 1996 in violation of R.C. 2907.02(A)(2), the same Revised Code section Hall was alleged to have violated in Counts 2 and 4.

{¶ 15} Count 8 charged Hall with sexually battering A.Z. between July 1, 1994 through June 30, 1996 in violation of R.C. 2907.03(A)(5), the same Revised Code section Hall was alleged to have violated in Counts 3 and 5.

### Hall's Sexual Abuse of E.A.

{¶ 16} As originally charged, the indictment set forth nine charges related to Hall's sexual abuse of his stepdaughter, E.A., between June 1, 1995 through October 1, 1995, June 1, 1997 through October 1, 1997, August 1, 1998 through December 31, 1998, and October 1, 1999 through December 31, 1999. Those charges consisted of five counts of rape and four counts of sexual battery. Two of those charges, Counts 16 and 17, which charged Hall with raping E.A. between October 1, 1999 through December 31, 1999 in violation of R.C. 2907.02(A)(2), as well as sexually battering E.A. between October 1, 1999 and December 31, 1999 in violation of R.C. 2907.03(A)(5), were later nolled by the state prior to trial. Therefore, when this case ultimately went to trial in August of 2020, Hall faced the following seven charges related to his sexual abuse of his stepdaughter, E.A.

{¶ 17} Count 9 charged Hall with raping E.A. between June 1, 1995 through October 1, 1995 in violation of R.C. 2907.02(A)(1)(b), the same Revised Code section Hall was alleged to have violated in Count 1.

{¶ 18} Count 10 charged Hall with raping E.A. between June 1, 1995 through October 1, 1995 in violation of R.C. 2907.02(A)(2), the same Revised Code section Hall was alleged to have violated in Counts 2 and 4.

{¶ 19} Count 11 charged Hall with sexually battering E.A. between June 1, 1995 through October 1, 1995 in violation of R.C. 2907.03(A)(5), the same Revised Code section Hall was alleged to have violated in Counts 3, 5, and 8.

{¶ 20} Count 12 charged Hall with raping E.A. between June 1, 1997 through October 1, 1997 in violation of R.C. 2907.02(A)(2), the same Revised Code Section Hall was alleged to have violated in Counts 2, 4, and 10.

{¶ 21} Count 13 charged Hall with sexually battering E.A. between June 1, 1997 through October 1, 1997 in violation of R.C. 2907.03(A)(5), the same Revised Code section Hall was alleged to have violated in Counts 3, 5, 8, and 11.

{¶ 22} Count 14 charged Hall with raping E.A. between August 1, 1998 through December 31, 1998 in violation of R.C. 2907.02(A)(2), the same Revised Code section Hall was alleged to have violated in Counts 2, 4, 10, and 12.

{¶ 23} Count 15 charged Hall with sexually battering E.A. on August 1, 1998 through December 31, 1998 in violation of R.C. 2907.03(A)(5), the same Revised Code section Hall was alleged to have violated in Counts 3, 5, 8, 11, and 13.

**Bill of Particulars**

{¶ 24} On August 15, 2019, Hall moved the state for a bill of particulars. The state responded to Hall's request on September 19, 2019. Aside from the facts already alleged in the multi-count indictment set forth above, and in addition to tracking the language of the Revised Code sections Hall was alleged to have violated, the bill of particulars also provided the locations where Hall's alleged sexual abuse of A.Z. and E.A. had occurred. Specifically, the bill of particulars included, in pertinent part, the following additional information.

{¶ 25} Counts 1, 2, and 3 regarding Hall's sexual abuse of A.Z. between July 1, 1991 through June 30, 1993, was alleged to have occurred at 505 Gilpin Drive, Apartment 4, Springboro, Warren County, Ohio.

{¶ 26} Counts 4 and 5 regarding Hall's sexual abuse of A.Z. between July 1, 1993 through June 30, 1995, was alleged to have occurred at 290 W. Market Street, Springboro, Warren County, Ohio.

{¶ 27} Counts 7 and 8 regarding Hall's sexual abuse of A.Z., as well as Counts 9, 10, and 11 regarding Hall's sexual abuse of E.A., between July 1, 1994 through June 30, 1996, was alleged to have occurred at 7248 Eyler Drive, Clearcreek Township, Warren County, Ohio.

{¶ 28} Counts 12, 13, 14, and 15 regarding Hall's sexual abuse of E.A. between June 1, 1997 through October 1, 1997 and August 1, 1998 through December 31, 1998, was alleged to have occurred at 360 Fairway Drive, Springboro, Warren County, Ohio.

### Hall's Motion to Sever

{¶ 29} On January 24, 2020, Hall moved the trial court to sever the charges related to A.Z. from the charges related E.A. To support this motion, Hall initially argued that "the counts are not connected." Hall also argued that "permitting joinder of all the indicted counts for trial court prejudice [his] due process rights to a fair trial because evidence of other acts would not be admissible if the offenses were tried separately." Hall further argued that "there is insufficient similarity" between the charges "to justify joinder at trial because the allegations asserted against [him] are different and distinct." The trial court denied Hall's motion in a decision issued on August 6, 2020. In so holding, the trial court found Hall had failed to establish that he would be prejudiced by the joinder of the offenses, "which stem from a single indictment albeit with 2 separate alleged victims."

### Hall's Motion to Disclose Transcript of the Grand Jury Proceedings

{¶ 30} On March 19, 2020, Hall moved the trial court to disclose a transcript of the grand jury proceedings or, alternatively, to have the trial court conduct an in-camera review those proceedings. To support this motion, Hall argued that disclosing a transcript of the

grand jury proceedings was necessary because the bill of particulars was "patently incomplete as to any substance of the allegations against Hall." Therefore, according to Hall, either disclosing a transcript of the grand jury proceedings to him or, alternatively, having the trial court conduct an in-camera review of those proceedings, was necessary so that he could "create a sufficient defense" given the state had not provided him with "specific times of the alleged sexual acts" and the "substantive" nature of A.Z.'s and E.A.'s allegations.

{¶ 31} On August 6, 2020, the trial court granted Hall's alternative motion requesting the trial court conduct an in-camera review of the grand jury proceedings. Once that in-camera review was complete, the trial court denied Hall's original motion requesting disclosure of a transcript of grand jury proceedings at that time. The trial court explained its decision to deny Hall's motion at a pretrial hearing held on August 12, 2020. During that hearing, the trial court informed Hall that he was "not going to get the grand jury transcripts" because, after reviewing "the indictment, the bill of information and the testimony in the grand jury," that "the bill of particulars give[s] you sufficient specificity." The trial court also informed Hall that the state was "not required to provide you with that specific information unless they have it so – ."

{¶ 32} The trial court further informed Hall that "the Supreme Court is very clear with regard to the specificity required in the bill of information," that the trial court had reviewed a transcript of the grand jury proceedings, and that "there's not any additional information coming." The trial court further informed Hall that he did not have an argument under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), based on the trial court's review of the transcript of the grand jury proceedings. This was in addition to the trial court stating, "I understand what you're saying. But I'm saying that the law does not support what you're saying in allowing the secrecy of the grand jury to be unveiled, based upon that argument

that you're making."

## Hall's Five-Day Jury Trial

{¶ 33} On August 24 through August 28, 2020, a five-day jury trial was held on the matter. The following is a summary of the relevant arguments, testimony, and evidence presented during each of those five days.

*Day 1: The State's Opening Statement*

{¶ 34} The state's opening statement began with the state claiming Hall wanted "everyone to think he had a perfect life" even though behind the scenes "his daughters," A.Z. and E.A., "were holding a perfect secret," i.e., that Hall had "raped" both A.Z. or E.A. prior to either of them turning 13 years old. The state then noted that Hall's "crimes span more than a decade," and "occurred with such frequency and of such duration" that, tragically for A.Z. and E.A., "the abuse begins to run together." The state then informed the jury that it would be hearing about three separate instances related to Hall's alleged sexual abuse of A.Z. that was set forth in Counts 1, 2, 3, 4, 5, 7, and 8. Specifically, as the state informed the jury:

> [1] The first event for [A.Z.] happened approximately the time period of 1991 to 1993. She was 11 years old. It happened at the Gilpin Apartments in Springboro, Ohio. Given her age, that's one count of rape, one count of rape by force, and one count of sexual battery. That's Counts 1, 2, and 3.

> [2] The next incident of abuse that you're going to hear from [A.Z.] about [what] happened at the West Market Street house, 290 West Market Street in Springboro. One count of rape by force, one count of sexual battery. That's Counts 4 and 5.

> [3] And then you're going to hear from her, Counts 6 and 7 – I'm sorry, seven and eight, rape by force, sexual battery for abuse that she suffered at [Hall's] hands at the Eyler Drive address and that's in Clearcreek Township.

{¶ 35} The state then informed the jury that it would also be hearing about three separate instances related to Hall's sexual abuse of E.A. that was set forth in Counts 9, 10,

11, 12, 13, 14, and 15. Specifically, as the state informed the jury:

> [1] For [E.A.], her abuse began at the Eyler Drive address in Clearcreek Township. You're going to hear from her about an abuse that happened, a specific instance of rape and sexual battery that occurred against her in the summer of 1995 when she was 12 years old.
>
> [2 & 3] Following that, the family moved to 360 Fairway Drive in Springboro. The next two instances for [E.A.] relate to sexual abuse that she occurred – that occurred, [Hall] committed against her in the summer of 1997, and in the fall of 1998 at the Fairway Drive address.

{¶ 36} After setting forth the evidence it believed the jury would hear, the state then asked the jury the rhetorical question of "how did we get here?" The state then described the events that led to Hall marrying A.Z.'s mother, S.H., the birth of A.Z.'s half sister and Hall's only biological child, A.L., Hall adopting A.Z. during his marriage to S.H., Hall and S.H.'s divorce, and the alleged sexual abuse that Hall perpetrated against A.Z. following Hall's and S.H.'s divorce while Hall was living at the Gilpin Apartments in Springboro, Warren County, Ohio. The state then noted that it was at this time that Hall met his current wife, E.A.'s mother, and the woman who would later become A.Z.'s stepmother, B.H. The state then informed the jury that, in preparation of marrying B.H., Hall moved out of the Gilpin Apartments and into a house located on 290 W. Market Street in Springboro, Warren County, Ohio, where Hall's alleged sexual abuse of A.Z. continued.

{¶ 37} The state then informed the jury that A.Z. would testify and tell the jury "about how she set booby traps in her room to try to keep [Hall] from coming in." The state also informed the jury that A.Z. would herself testify and tell the jury "about how she tied her pajama bottoms in knots to try to keep him from pulling her pants off," but that Hall still "came into her room," that Hall still "put his hands in her underwear," and that Hall still "put his fingers inside of her."

{¶ 38} The state then noted that after Hall and B.H. were married that they moved to

a house located at 7248 Eyler Drive in Clearcreek Township, Warren County, Ohio. The state informed the jury that A.Z. would testify that Hall continued to sexually abuse her at the house on Eyler Drive. Specifically, the state informed the jury that A.Z. would "tell [them] about one of the most tragic nights of her life" when "[s]he had a sleepover at her house with her friends and they were all camped out in the living room" during which time A.Z. "woke up surrounded by her friends, terrified, embarrassed, ashamed, [Hall] with his fingers inside of her, terrified that her friends would see" and "that someone would find out."

{¶ 39} Moving on to E.A., the state informed the jury that "after the move to the Eyler house, [A.Z.'s] nightmare was continuing, but [E.A.'s] was just beginning." The state noted that this was because shortly after Hall and B.H. moved into the Eyler Drive house that E.A. "began waking up in the middle of the night to find [Hall] in her room." The state also noted that this was because, on one particular night in the summer of 1995, E.A. remembers Hall coming into her bedroom, "she remembers the weight of him on top of her," and she remembers "how he engaged in vaginal intercourse with her." The state then told the jury that E.A. also remembers "when she woke up in the morning, not even having her first period, with blood on the sheets, and how she was afraid. She was scared."

{¶ 40} The state then noted that, in 1996, Hall and B.H. moved to a home located on 360 Fairway Drive in Springboro, Warren County, Ohio. The state informed the jury that upon moving into the home on Eyler Drive that A.Z. had her own room in the basement, "[s]o she felt a lot safer," but that E.A.'s room was on the main floor, "[a]nd where [A.Z.'s] abuse was ending, [E.A.'s] continued 'cause [Hall] had now turned his attention to her." The state then told the jury that E.A. would herself testify about one particular night in the summer of 1997 when she remembers awaking up "to [Hall] in her room, engaging in intercourse with her." The state also told the jury that E.A. would testify about "the pain of it, and she remembers him sitting on the bed afterwards, his penis exposed, masturbating

while he continued to penetrate her."

{¶ 41} Continuing, the state then told the jury that E.A. would additionally testify about an incident in the fall of 1998 where E.A. "remembers laying on her back, no pants and no underwear on." The state told the jury that E.A. also remembers that "[t]he sheets were pushed up, exposing her lower body as [Hall] engaged in vaginal intercourse with her." The state told the jury that E.A. further remembers seeing Hall "again sitting on the edge of the bed afterwards," but that "when he saw her looking at him, he got up quickly, threw the sheets over her head and left the room."

{¶ 42} The state then informed the jury that A.Z. left the house after graduating from high school, got married, and, in 2003, told her husband, M.Z., "that [Hall] had sexually abused her as a child. She didn't tell her mother until 2016." As for E.A., the state told the jury that on the day she graduated from high school, "she left a letter in the house and left, not to return." The state then noted that E.A. "tried to make a go of it on her own, but she couldn't," so she agreed "finally to go and work for Mr. Hall's real estate agency, and [A.Z.] had worked there briefly as well." The state then noted, however, that E.A. "wasn't happy" working for Hall's real estate agency so "she too eventually left," got married, and moved away from Ohio to Arizona. The state also told the jury that neither A.Z. or E.A. "had ever told each other about what [Hall] had done to them," that both A.Z. and E.A. "wanted to move on with their lives" and "put the abuse behind them," but that "they couldn't."

{¶ 43} The state then informed the jury that, after Hall and B.H. came to visit E.A. in Arizona in December of 2018, E.A. decided to tell her younger stepsister, A.L., that Hall "had sexually abused her when she was a child." The state told the jury that A.L. then talked to her mother, S.H., who told her to talk to her half sister, A.Z. The state informed the jury that A.L. then called A.Z., who, for the first time, "admitted to her younger sister what [Hall] had done to her as a child. And that's how [E.A.] and [A.Z.] found out that they

weren't alone after all these years." The state informed the jury that A.Z. and E.A. then decided to report what Hall "had done to them," which resulted in an investigation, and, ultimately, Hall being charged with a multi-count indictment and the matter being taken to trial.

{¶ 44} The state then informed the jury that Hall had initially "denied that he had ever done anything to [A.Z.] and [E.A.]," or "at least that he didn't remember doing anything to them, is the way he put it." The state also informed the jury that Hall had claimed "he was a sleepwalker, that he took sleeping pills, he used to be a drinker." The state further informed the jury that while Hall had claimed E.A. could not be trusted, "he'd never known [A.Z.] to lie" and that "[h]e'd never known [A.Z.] to try to intentionally hurt someone." The state additionally informed the jury that Hall told A.Z. and E.A. "he was seeking professional psychological counseling." The state then noted for the jury that Hall "finally was willing to admit that, in fact, he had touched both [A.Z. and [E.A.]," but that Hall "begged them not to tell" his mother, E.H., his wife, B.H., the pastor at his church, or his daughter, A.L.

{¶ 45} The state then informed the jury that Hall "admitted that he had never been attracted to [A.L.], his biological daughter, the way he had been to [A.Z. and E.A.]" The state also informed the jury that Hall had told A.Z. and E.A. "that he was writing his confession, but he kept delaying. Promised he was going to e-mail it, but he didn't." The state then told the jury that, "[f]inally, on May the 3rd, 2019, law enforcement executed a search warrant on Mr. Hall's residence in Waynesville and on his business in Springboro," during which Hall "said, I know why you're here." The state also told the jury that Hall then "directed them to a letter that he had hidden in the bottom of a waste basket in his office, told the police it was a love letter to his daughters."

{¶ 46} Coming to the end of its opening statement, the state told the jury that for years A.Z. and E.A. had "hid the abuse that Mr. Hall inflicted on them. But now, more than

20 years later, * * * they're here to tell you that behind Tim Hall's perfect life was a perfect lie, that when they were children, that he had raped them."  The state then said in regard to Hall's alleged sexual abuse of A.Z., "[w]hen you have heard the evidence and testimony of this case, members of the jury, you will find [Hall] guilty of Counts 1, 2 and 3, rape of a child under the age of 13, rape by force and sexual battery for the abuse that he inflicted on [A.Z.] at the Gilpin Apartments."  The state also said to the jury, "[y]ou will find him guilty of Counts 4 and 5, rape by force and sexual battery for the abuse that he inflicted on [A.Z.] at the West Market Street house," and "[y]ou will find him guilty of Counts 7 and 8, rape by force and sexual battery, for the abuse that he inflicted on [A.Z.] at the Eyler Drive house."

{¶ 47} The state then said in regard to Hall's sexual abuse of E.A., "[y]ou will find him guilty of Counts 9, 10 and 11, rape of a child under 13, rape by force, and sexual battery for his abuse of [E.A.] at the Eyler Drive house," "[y]ou will find him guilty of Counts 12 and 13, rape by force and sexual battery, for his abuse of [E.A.] in the summer of 1997 at the Fairway Drive house," and "you will find him guilty of Counts 14 and 15, rape by force and sexual battery, for the abuse he inflicted on [E.A.] at the Fairway Drive house in the fall of 1998."  The state then concluded its opening statement by stating, "[m]embers of the jury, it has taken more than 20 years, but [Hall's] lies end now.  Thank you."

*Day 1: Hall's Opening Statement*

{¶ 48} Hall began his opening statement by claiming the state had just told a "fantastic story," but that it was "not what happened."  Hall then told the jury that "we live in a society where this topic is prevalent," where people are "coming out" and making claims of sexual abuse, "these old and these delayed claims, when these people come forward last minute" and "late," a lot of which are "just simply false.  They are.  That's the case here."

{¶ 49} Hall then told the jury that it had "heard all the negative" there was to hear about him, which entitled the jury to hear "about some good," too.  This included the fact

- 14 -

that Hall followed "the rest of the men in the family" and joined the Navy after graduating from high school, which ultimately resulted in Hall being stationed on the USS *Saratoga*. This also included the fact that Hall had "one of the top" real estate agencies in the area prior to "when he stopped running the business because of this case." Hall told the jury that this was in addition to the fact that he "gave back to his community while running this real estate business" with his wife, B.H., that he was a member of the local Baptist church, that he sponsored an organization to assist with abused animals, as well as helping with the Miracle Network, and that he "helped run and organize the local chapter of the nonprofit that would buy land [and] build homes for disabled Veterans returning home."

{¶ 50} Hall then told the jury that A.Z.'s and E.A.'s claims against him were nothing more than "false allegations" that start to fall apart when considering "[t]he investigation" into A.Z.'s and E.A.'s claims, was "sloppy," "incomplete," and "extremely misleading." Hall told the jury that because of the inadequate investigation that A.Z.'s and E.A.'s claims that the state would have to "throw up a smoke screen" in order to secure a conviction. To support this claim, Hall told the jury that the investigation into A.Z.'s and E.A.'s claims did not include a search of public records, some of which were "right down [the] hallway, domestic relations court." Hall told the jury that this was significant because a search of those records "would have uncovered time lines to show that the time line as you have it and [as] you will see it falls apart. The government didn't go get that information. Thankfully we did." Hall also told the jury that this was significant because it showed A.Z. and E.A. "had many safe places they could go report this. They did not."

{¶ 51} Continuing his opening statement, Hall told the jury that A.Z. claimed to have reported the alleged sexual abuse to "a mandatory reporter, a schoolteacher, in 1996," but that "school teacher does not recall that conversation." Hall also told the jury that the state "made no attempt" to look at A.Z.'s and E.A.'s school records or medical records. Hall

further told the jury that the lead detectives in the case, Detective Kevin Barton with the Clearcreek Township Police Department and Detective Terry Dunkel with the Springboro Police Department, did not "independently interview" A.Z. or E.A. and "never challenged these women's stories to gauge the credibility[.]" Hall then stated to the jury the following:

> Now, interestingly enough, so in this time frame, they [the state] want to paint that – that it wasn't this happy family picture, which we disagree with. That during and after, you're going to see letters. You're going to see cards, I love yous. You're going to hear from these women with their voices and cards, Father's Day cards, many years after the events took place, the alleged events took place.
>
> I love yous, Happy Father's Day, thank you, dad, for giving me the best life in the world. Thank you for giving me my start in my real estate business, both of them. Year after year, birthday after birthday, Father's Day after Father's Day, holiday after holiday.

{¶ 52} Hall then told the jury that he had made "some admissions" in recorded phone calls, text messages, and e-mails with A.Z. and E.A., but that those admissions needed to be taken "in context," since they were "secret phone calls" that he did not know were being made and designed to "trap" and "trick" him. Hall then told the jury that although he admitted to having "sexual contact" with A.Z. and E.A., that he had never engaged in "sexual conduct" with either A.Z. or E.A. as alleged. Specifically, Hall stated:

> On two occasions, he will tell you and he's told you in the phone calls and the letters, I had contact. Folks, we are not here for contact. The State wants you to believe it 'cause that – well, it had to do – do the conduct. It's not the law and that's not why we are here. Contact is touching; conduct is penetration.

{¶ 53} Hall then told the jury that, in summary, "there's no physical evidence," "[t]here are no medical records to support any of these claims," "[t]here are absolutely no counseling records of either one of these women," "[t]here's no interviews by our police department of either one of these alleged victims," and "[t]here's no report to any safe place when they were available. Hall then stated:

In conclusion, we live in this age that many describe as a cancel culture. And what that is the – the call-out culture, the Me Too era, where opinions and feelings are more important than the facts and the truth.

In today's world, the only place that appears to be left in this country where the truth still matters is a courtroom. You will hear the truth over the next few days.

We will admit the truth starts that he's a flawed man. We told you he's done things. He's apologized for those things. But that is not why we're here. That's not why we're here. He is not charged with those two things.

Concluding his opening statement, Hall stated, "[n]ot only [are] we confident that there's reasonable doubt," that "we're confident that these allegations are simply not true and you're going to find that, at the end of the day, he's not guilty of all of these charges. Thank you, ladies and gentlemen."

*Day 1: Testimony and Evidence*

{¶ 54} A.Z., who the record indicates Hall adopted in 1987 when A.Z. was seven years old, was the only witness to testify on the first day of trial. As part of her testimony that day, A.Z. testified that her mother, S.H., met Hall in Jacksonville, Florida in 1985. A.Z. testified that Hall was at that time enlisted in the United States Navy and stationed on the USS *Saratoga*. A.Z. testified that shortly after her mother and Hall met that her mother agreed to move to Ohio with Hall. A.Z. testified that once she and her mother moved to Ohio, which A.Z. testified occurred in May of 1985, that she and her mother resided with Hall at the Gilpin Apartments located in Springboro, Warren County, Ohio. A.Z., who was 40 years old at the time of trial, testified that her mother subsequently married Hall in the summer of 1985. A.Z. testified that the following year, on November 18, 1986, her mother gave birth to her half sister and Hall's only biological child, A.L.

{¶ 55} A.Z. testified that she, her mother, and Hall no longer lived at the Gilpin Apartments at the time A.L. was born in the fall of 1986. A.Z. testified that she was instead

residing with her mother and Hall in a house located on Woods Road in Springboro, Warren County, Ohio. A.Z. testified that her mother and Hall later separated, and subsequently divorced, when she was in the fifth or sixth grade and approximately 11 to 12 years old. When asked if she remembered a time when Hall touched her inappropriately prior to when her mother and Hall were divorced, A.Z. testified that she did. A.Z. then testified and described this incident as follows:

> There was a night that my mom was at work and he was giving me a massage that was very detailed, all over my – you know, my back, a very concentrated, up into the – my top of my chest. It lasted a while. My sister was next to me and she wanted him to massage her as well, and he did not want to do that [to A.L.]

A.Z. testified that the morning following this "massage" incident between her and Hall that Hall apologized and acknowledged that "he got too into the massage and that it was inappropriate touching."

{¶ 56} A.Z. testified that following her mother's divorce from Hall that Hall and her mother entered into a shared parenting plan. A.Z. testified that this shared parenting plan began when Hall was again living at the Gilpin Apartments. When asked if anything inappropriate happened between her and Hall at the Gilpin Apartments after Hall and her mother, S.H., were divorced, A.Z. testified that, yes, there had. Specifically, A.Z. testified:

> Yes. He would start coming into my bedroom at night and lifting up – started with lifting up my shirt and fondling my breasts, and then would put his hands down my pants, and then touch my vagina and inside my vagina.

{¶ 57} A.Z. then testified that, although she never saw Hall's penis exposed, Hall had engaged in "sexual conduct" with her at the Gilpin Apartments when she was in the sixth grade prior to her turning 13 years old. A.Z. testified that Hall did this "every night" she stayed at the Gilpin Apartments with Hall despite her best efforts to stop Hall from sexually abusing her. A.Z. testified that this included tying her sweatpants "very tightly," or, as the

sexual abuse continued, to "wear jeans to bed because they were not easy to take off." A.Z. testified that she would also "try to stay up all night," because if she was awake Hall "wouldn't come in the room." A.Z. testified that this was in addition to her trying to "ball [herself] into the corner [of the bed and the wall] to try to make it more difficult to be reached."

{¶ 58} When asked why she would take all these measures, A.Z. reiterated that it was "[b]ecause [Hall] would come in and I would wake to him pulling my pants off of me and putting a finger inside of me." Asked to describe how it made her feel to have Hall, her adopted father, put his fingers inside of her vagina, A.Z. testified, "[p]hysically it felt – there was a pain, but I think – I mean, I – I just felt gross, really, and sad and confused and mad at myself and hatred and love all at the same time," like, "[h]ow could I hate and love my dad at the same time[?]" A.Z. also testified that she was "very scared" and "didn't know what to do" when she woke up to find Hall's fingers already inside of her vagina.

{¶ 59} But, although A.Z. testified that she was scared, A.Z. nevertheless testified that she would still "sometimes" lift up her feet and try to "kick" Hall off of her. However, even when she would try to kick Hall away, A.Z. testified that Hall would then just "sush" her and say "shh, shh, shh, shh." A.Z. testified that when this happened she would "stay quiet" and let Hall finish because she "didn't know what else to do" and did not want to get in trouble. A.Z. testified that she would also "kind of just go to another place," "try to not think about what was happening at that minute," close her eyes, and "wait for it to be over." A.Z. further testified that because of Hall's repeated sexual abuse of her prior to her turning 13 years old she thought there was "something wrong" with her.

{¶ 60} A.Z. testified that while Hall was living at the Gilpin Apartments Hall began dating a woman, B.H., a woman who later became her stepmother when B.H. and Hall were married in the fall of 1994. A.Z. testified that E.A., the other victim of Hall's sexual abuse, is B.H.'s daughter, thereby making E.A. her stepsister and Hall's stepdaughter at the time

Hall and B.H. were married. A.Z. testified that E.A. is three years younger than her and three years older than her half sister, A.L. A.Z. also testified that when she and E.A. were younger that she would get along with E.A., "[a]s sisters do," "[s]ometimes; sometimes not." A.Z. further testified that E.A. was not someone she would have ever confided in while growing up, nor was E.A. someone that she would have ever told that Hall had been sexually abusing her while Hall was living at the Gilpin Apartments.

{¶ 61} A.Z. testified that Hall later moved from the Gilpin Apartments to a home on Market Street in Springboro, Warren County, Ohio. A.Z. testified that this move occurred when she was in seventh grade and approximately 13 years old. Asked to describe what was going on during that time in her life, A.Z. testified "[t]he abuse was still going on, so I was feeling really awful inside, a lot of self-hatred." A.Z. also testified that she "started getting very stressed," noted that her "grades were slipping," and informed the jury that she was diagnosed with "an ulcer that [she] had to get treated with prescriptions." A.Z. further testified that she "stopped showering and brushing my hair" because she "thought it might make [her] look less attractive to [Hall]." But, as A.Z. testified, all this got was a response from E.A. telling her that she "needed to shower."

{¶ 62} A.Z. testified that in an effort to stop Hall from coming into her bedroom at night that she "started booby trapping" her room by propping up a cheap, full-length mirror against her bedroom door that would fall and crash against the floor when Hall tried to enter into her room. A.Z. testified that this happened "[a] lot" and, when it did, Hall "would run back down the hallway to his room." However, although A.Z. testified that she booby trapped her bedroom to keep Hall from entering, A.Z. testified that Hall was nevertheless able to come into her bedroom on occasion and, just like what he had done at the Gilpin Apartments, take off her pants and "touch inside" her vagina and "fondle " her breasts.

{¶ 63} A.Z. then again testified that waking up to Hall's fingers inside her vagina was

"painful" and felt "like stinging." When asked if she ever cried out, A.Z. testified that she did cry out, "dad," but that she would just be "sushed" by Hall or "he would stop and go back to his room." A.Z. testified that this made her feel "[s]cared, sad, unloved." A.Z. also testified that she "hated herself." A.Z. further testified that she was "ashamed" and "embarrassed" that Hall was sexually abusing her. A.Z. additionally testified that she felt like she did not have "a choice to not let it happen," that being sexually abused by Hall "was [her] life," and that she had to endure Hall coming into her bedroom at night to sexually abuse her "till it was over."

{¶ 64} A.Z. then testified that leading up to Hall and her stepmother, B.H., getting married that Hall purchased a home located at 7248 Eyler Drive in Clearcreek Township, Warren County, Ohio. A.Z. testified that she stayed with Hall at the home on Eyler Drive during her seventh, eighth, ninth, and tenth grade years. A.Z. testified that Hall continued to sexually abuse her during this time. A.Z. testified that this included one instance where she was having a sleepover with a group of friends only to wake up to Hall "putting his hands down [her] pants" and "putting his fingers insider [her] vagina." A.Z. testified that upon waking up that she whispered to Hall, "no, dad," to which Hall responded "[s]hh, shh, shh." A.Z. testified that she then "just laid there quietly so that no one would wake up."

{¶ 65} When asked why she did not try to wake up any of her friends while Hall was digitally penetrating her vagina, A.Z. testified, "I didn't want them to wake up and see what was happening. I was embarrassed. I would have been mortified." A.Z. also testified that she still did not tell E.A. about Hall sexually abusing her while she was living with Hall at the home on Eyler Drive. The same is true as it relates to her stepmother, B.H., as well as other members of her family. A.Z. testified that she kept quiet because she "didn't want to mess up the family." A.Z. testified that she also kept quiet because she was afraid that her family would not believe her, that she would "lose" them, that they would not speak to her

anymore, and that they would be angry with her.

{¶ 66} A.Z. did testify, however, that during her sophomore year of high school that she had told her chemistry teacher, N.J., about Hall sexually abusing her. A.Z. testified that she told N.J. about the abuse because N.J. was not that much older than her, possibly in her early 20s, and because she felt "kind of like a kinship, a friendship with her" that made her believe she "could talk to her about what was happening to [her] and she could help." But, although A.Z. testified that she was looking for help to get away from Hall's sexual abuse, A.Z. testified that she asked N.J. not to tell anyone else about what Hall had done to her. When asked if anything ever came of her telling N.J. that she was being sexually abused by Hall, A.Z. testified that nobody, not even her high school principal, ever came to talk to her about what she had told N.J. about the sexual abuse. Following this testimony, the trial court interjected and noted that this was a good time to break for the day.

{¶ 67} Once the jury left the courtroom, the trial court addressed the parties and noted a potential issue regarding the definition of "sexual conduct" given that Counts 1, 2, 3, 4, 5, 7, and 8 regarding Hall's sexual abuse of A.Z. were all alleged to have occurred prior to July 1, 1996. Specifically, as the trial court stated:

> The definition of sexual conduct seems drastically different in 1996, the jury instruction for that. * * * This is for offenses committed before 7/1/96. It says sexual conduct means vaginal intercourse between a male and female, anal intercourse, fellatio, cunnilingus between persons regardless of sex. Penetration, however, slight, is sufficient to complete vaginal-anal intercourse. * * * There's no mention of insertion of other objects into the vaginal or other cavities of the body. Is – is there something I'm missing here?

The state responded and asked the trial court to hold off on discussing that issue until the next morning so that both parties could have the opportunity to research the matter further. The trial court agreed and recessed for the day.

*Day 2: Testimony and Evidence*

{¶ 68} The second day of trial started with Hall arguing that "the law's pretty clear that, as a matter of law," the state could not move forward on Counts 1, 2, 3, 4, 5, 7, and 8 related to Hall's alleged sexual abuse of A.Z. between July 1, 1991 through June 30, 1996 given that A.Z. testified to only digital penetration rather than vaginal or anal intercourse. To support this argument, Hall correctly noted that prior to September 3, 1996 "felonious sexual penetration was digital penetration and rape was a separate charge." Therefore, according to Hall, "as a matter of law, the State cannot go forward on the charges of rape that – that predate – they're based on digital penetration before 1996 when the law changed," because "by definition, the improper crime was presented to the grand jury."

{¶ 69} To this, the trial court responded to Hall's argument and stated, in pertinent part, the following:

> Listen, the bottom line is I'm not in a position as I sit here right at this moment after I've heard less than half of one witness to make any determinations on that. * * * I don't know what the rest of the evidence is going to be. There may be evidence that does match this. * * * I think a Rule 29 at the close of the State's case would be the appropriate time to deal with this issue, and not in the middle of the first witness. * * * That's why I think it's just premature.

{¶ 70} Hall then argued that if the trial court would not dismiss the charges related to Hall's alleged sexual abuse of A.Z. that, at the very least, "demonstrates particularized need for a copy of the grand jury transcript to be provided to the defense." The trial court agreed and stated:

> All right. Here's what we're going to do today. And, again, I don't – I have no doubt that everybody was surprised to learn that the definition of sexual conduct was different back in 19 – pre 1996. * * * What I'm going to do at this point in time is, based upon my review of the grand jury testimony and the testimony that I heard yesterday from [A.Z.], is that I am going to release to the defense the grand jury testimony related to [A.Z.] only.

{¶ 71} The trial court then stated:

That Court finds that there are certainly – again, based upon my review of the grand jury testimony, even had I known the difference in the definition of sexual conduct prior to yesterday that had – it was different back then, the Court was not aware of it. I'll admit it.

I would not have – I wouldn't have changed anything. But based upon the testimony that the Court has heard so far, I am going to release the grand jury testimony to the defense with – with regard to [A.Z.] only.

{¶ 72} The jury was then returned to the courtroom and the state resumed its direct examination of A.Z. A.Z. testified that after living at the home on Elyer Drive, Hall moved to a home located at 360 Fairway Drive in Springboro, Warren County, Ohio. A.Z. testified that she lived at the home on Fairway Drive beginning in the middle of her sophomore year of high school to when she graduated from high school in the summer of 1999. A.Z. testified that following her graduation from high school she moved out of the home on Fairway Drive and went to live with her mother, S.H., before ultimately moving into her grandmother's house. When asked if Hall sexually abused her at the Fairway Drive home, A.Z. testified, "No."

{¶ 73} A.Z. then testified and explained that, even after moving away from Hall, she did not go to the police because "at some point, every day became a day past the abuse," and she "just felt like [she] could move past it." A.Z. testified that in attempting to move on that she enrolled at a local community college and began working as a contractor at the nearby Air Force base prior to obtaining her real estate license. A.Z. testified that after acquiring her real estate license, and working as a real estate agent on her own for a few years, Hall and her stepmother, B.H., invited her to work as a buyer's agent for their real estate business. A.Z. testified that she agreed to work for Hall and B.H. because they "had a good real estate team." A.Z. also testified that she agreed to work for Hall and B.H. because they "didn't give praise a lot" when she was growing up, so it "felt very good that

- 24 -

they wanted me to join their team," and "like they were proud of [her] and [she] liked that feeling."

{¶ 74} A.Z. testified that after working for Hall's and B.H.'s real estate business for approximately ten years she and her husband, M.Z., left Ohio and moved to South Carolina. When asked why she decided to move south, A.Z. testified that she and her husband, along with their two minor children, moved to South Carolina partly because they felt like they "were under the thumb of [their] family a lot," "[j]ust a lot of controlling," and "very controlling over what [they] needed to be doing, when [they] needed to be doing it, especially when [she] was working on their team." A.Z. testified that this included celebrating birthdays and holidays with Hall and B.H. because, if they were not able to attend, they would be subject to "[a] lot of guilt, guilt trips, negative conversations."

{¶ 75} A.Z. testified that after moving to South Carolina she had a conversation with her mother, S.H., about Hall sexually abusing her as a child. Describing this conversation, which A.Z. testified occurred sometime in 2016, A.Z. testified that she had asked her mother "why in the sixth grade she had taken [her] to see a counselor about – to ask [her] if [Hall] was touching me." A.Z. testified that what she had told her mother "what she thought had happened was true," i.e., that Hall had been sexually abusing her as a child. A.Z. testified that she also told her mother she was going to have to tell her half sister, A.L., who was at that time pregnant with her first child, "because [she] didn't want something to happen to those – to her child." A.Z. testified that this was the first time she had ever told her mother anything about Hall's sexual abuse.

{¶ 76} A.Z. testified that in December of 2018 her half sister, A.L., gave birth to her second child, a girl. A.Z. testified that after A.L. had given birth A.L. came to visit her in South Carolina. A.Z. testified that at this same time Hall and her stepmother, B.H., had gone to Arizona to visit E.A. A.Z. testified that during this time her mother, S.H., encouraged

her to tell A.L. "about what had happened as a child because [Hall] and [B.H.] were babysitting and planning on babysitting both [of A.L.'s children] once [A.L.]" returned home to Ohio and resumed working. A.Z. testified, however, that she did not tell A.L. that Hall had sexually abused her as a child. When asked why that was, A.Z. testified that, "[i]t's hard to come up with the words to tell your sister what your dad did to you when you were a kid."

{¶ 77} A.Z. testified that shortly after A.L. returned to Ohio she received a call from A.L. A.Z. testified that during this call A.L. told her she had just gotten off the phone with E.A. who told her that Hall "is a rapist and a pedophile." A.Z. testified that A.L. then asked her if she thought E.A.'s claims could be true? A.Z. testified that she responded to A.L. and said, "yes," she did "believe that it's true because it happened to [her], too." A.Z. testified that A.L. then told her about what E.A. had relayed to her about Hall's sexual abuse. A.Z. testified that she was "really surprised" to hear about E.A. because she did not know "that there was somebody else." A.Z. also testified that she felt "really guilty" because "if [she] would've said something, as a child, then [she] could have protected [E.A.]"

{¶ 78} A.Z. testified that she then told A.L. to talk to their mother, S.H., because in 2016 she had already told their mother about Hall sexually abusing her as a child. A.Z. testified that she then got off the phone with A.L. and called her mother, S.H., "and said that [E.A.] told [A.L.] that the same thing had happened [to her]. And [A.L.] is going to be calling [her] about it." A.Z. testified that she then waited until that night to call E.A. A.Z. testified that she then "told [E.A.] that [A.L.] had called [her] and that the same things that she was telling [A.L.] had happened to [her], too, and that [she] was really sorry." When asked why she was apologizing, A.Z. testified that it was because she "felt responsible" for what had happened to her as a child.

{¶ 79} A.Z. testified that after speaking with E.A. she "pretended everything was fine"

because she was taking her daughter on a surprise trip out of town and "just really wanted to get through that before confronting [Hall and her stepmother, B.H.]" So, unlike E.A., who, according to A.Z., "felt like she was going to confront them right away," A.Z. testified that she "was just going to turn [her] phone off and have [her] trip with [her] daughter and figure it out when [she] got back." A.Z. then testified that even after she returned from her trip, however, that "it took a while" to confront Hall and B.H. because she "just needed time without just talking with them to figure out what the next step should be."

{¶ 80} A.Z. also testified that it was not an easy decision to come forward because she initially "just thought honestly telling [A.L.] – I would tell [A.L.] and that would be it. She could keep her kids safe. She would – have the knowledge and we could just move on from that." However, although hesitant, A.Z. testified that she ultimately decided to contact the police and report Hall. To do this, A.Z. testified that her husband, M.Z., initially contacted the Springboro Police Department to ask what she would need to do to make a report. A.Z. testified that she was told to first make a report with the police where she lived in South Carolina. A.Z. testified that she then made an appointment with a detective in South Carolina with whom she was acquainted because she had been her son's tee-ball coach.

{¶ 81} A.Z. testified that once at that appointment, which occurred in February of 2018, she told the detective that she had been sexually abused by Hall as a child. A.Z. testified that the detective then "immediately called Springboro Police and talked to a Detective there." A.Z. testified that the detective who had been contacted, Detective Dunkel, then "started asking [her] questions that [she] wasn't quite ready to answer 'cause [she] wasn't prepared to make a report that day." A.Z. testified that she instead sent a letter to the Springboro Police Department describing the sexual abuse that she had endured while a child.

{¶ 82} A.Z. testified that once the investigation began into her allegations against

Hall that she participated in a series of recorded telephone calls with Hall. A.Z. testified that during these calls she confronted Hall with the same information that she had previously testified to on the first day of trial. The first of these telephone calls, which occurred on April 18, 2019 and lasted only 52 seconds, was then played for the jury. Once this recording concluded, the trial court requested a sidebar with the parties, following which the trial court excused the jury from the courtroom.

{¶ 83} Once the jury had exited the courtroom, the trial court addressed the parties and again noted that, because the definition of "sexual conduct" had changed effective September 3, 1996, it was in a "spot" because it "didn't hear anything else with the continuation of this particular alleged victim" that would support a finding that Hall had engaged in "sexual conduct" with A.Z. between July 1, 1991 through June 30, 1996. The trial court then noted that it felt the "need to try to correct this now before – before we go any further" because the testimony offered by A.Z. does not "fit" into the pre-September 3, 1996 definition of "sexual conduct" applicable to Counts 1, 2, 3, 4, 5, 7, and 8, the charges related to Hall's alleged sexual abuse of A.Z.

{¶ 84} To this, the state agreed and noted that "we're stuck with the 19 – it was originally 1974 definition of sexual conduct, in terms of the allegations that cover the time period of [A.Z.]" The trial court then stated:

> Okay. So then the question now becomes, do I allow you to continue with – with your case in chief with [A.Z.] as 404(b)? That's – that's where I'm at right now. * * * Or do I simply * * * give an instruction and tell the jury, look, this is what's happened. The definition of sexual conduct pre-1996 was different and it's it doesn't fit up with what's – what's been testified to so – that I'm dismissing those charges, and then give a strong instruction with regard to 404(b). That's where I'm at.

The trial court then noted that it was "trying to salvage some – something here" because "obviously," everyone has "invested a lot of time and energy to get to this point and I haven't

heard any other alternatives."

{¶ 85} Hall responded and argued that he did not think it was "fixable" and that there was no curative instruction the trial court could provide to the jury "that would cure the taint and the prejudice that has occurred" given the nature of A.Z.'s testimony. Hall also argued that a curative instruction would not be sufficient because:

> if you tell this jury why, that the, quote, that some people might consider to be a technicality of law because the [state] didn't properly indict the case, that jury is irreparably tainted. You can't fix that with a curative instruction.

{¶ 86} Hall instead argued that "it has to be a new jury. And we have to start over, whether we like it or not." In response, the trial court stated, in pertinent part, the following:

> I – again, the reason that I – the reason that I stopped things where I did was because I – it was my hope that we could correct the ship – the course of the ship. We're going in a – in a wrong direction here. So I was making a course correction. That's what – that was my suggestions, that we salvage this.

{¶ 87} The trial court then stated:

> I mean you, -- you guys all know the – the – the lengths that the Court has to go through during these – these times to bring in – you know, 50 people yesterday. I mean, I get it.
>
> But – but, again, I'm not hearing anything – I'm not hearing any other solutions. I think that the State's agreeing with my – my offer of solution that we proceed and I get – and I dismiss those, whatever those counts were. I give a limiting instruction right now and try to cure it and we – we make a – that course correction.

{¶ 88} Hall continued arguing against the trial court allowing the trial to continue with only a curative instruction provided to the jury because the jury has already heard A.Z.'s testimony and "[y]ou can't unring the bell." But, like before, the trial court responded to Hall's argument by stating the jury "would be entitled to hear that anyway under 404(b)."

{¶ 89} Changing tactics, Hall then argued, in pertinent part, the following:

> Okay. In a different context. Context means everything.

- 29 -

Coming in as a 404(b) to say this is uncharged criminal conduct, you can't consider for any other reason for the – other than the pattern under 404(b).

Here, they will have heard it first saying, the State is presenting this evidence in the context of guilt beyond a reasonable doubt. Those are two separate standards that – and the – and to say that a jury – and these are laypeople.

I mean, they've got – I – I have tried to explain these issues to people who are laypeople. They don't understand. These are – look at the lawyers in here. Look at the wealth of legal knowledge and wisdom we have and look at how we're struggling with it.

And you're going to tell me that a jury isn't going to struggle with that or wonder why?

{¶ 90} Unpersuaded, the trial court responded and stated, "[t]hey'd probably struggle with it less because they're not lawyers and they would simply say, oh, the Judge said this. I'm going to – I'm going to take that – to the bank." Hall then responded, "[b]ut the bottom line is, Judge, if you want to – if you want to assure that Tim Hall gets a clean and fair due process, it's got to be a mistrial. A curative instruction doesn't make it." The trial court judge then took a short recess to consider the matter further. A short time later, the trial court judge returned to the courtroom and resumed trial, stating:

All right. We're back on the record outside the presence of the jury. The Court is probably a little hasty in taking this recess and allowing this – this motion to be made at this point in time.

I don't know why, like in any other case, we wouldn't allow the State to continue to proceed. I think we all know where this is heading. But the appropriate time for a Rule 29 motion to dismiss those counts of the indictment would be at the close of the State's case.

I'm giving everybody advance notice that, based on what the Court has heard and the – and the concessions appears to be made that it would be the Court's intention to grant that motion at that time. But it's not right now.

So knowing where this is going with [A.Z.] and those counts relating to her, I'm going to allow the State to continue

- 30 -

presenting their case in chief, and then let's move this along. We know where this is going, and then I will make a ruling on the – the Rule 29 and we'll go from there. Motion for mistrial is denied.

{¶ 91} The jury was then returned to the courtroom. Once the jury was back in the courtroom, the state played for the jury a second telephone call between A.Z. and Hall that took place on April 18, 2019. During this telephone call, which lasted 32 minutes and ten seconds, Hall initially denied ever sexually abusing either A.Z. or E.A. when they were children. This included Hall denying that he had "any recollection" of ever coming into A.Z.'s bedroom at night, lifting up the sheets, and touching A.Z. inappropriately. However, after being pressed by A.Z., Hall stated that what A.Z. was claiming was an "interesting revelation" and that if he "was ever wasted and accidentally did something that is one thing," or that he may have been sleepwalking, or that maybe he is a paranoid schizophrenic with split personalities, but that while he did remember looking in on A.Z. while she was showering, he did not remember ever touching A.Z. inappropriately. This included the time A.Z. claimed Hall had touched her in a hotel room while returning from a wedding in Annapolis, Maryland.

{¶ 92} Beginning to hedge slightly from his initial outright denial, Hall then told A.Z. that he did not want to be labeled a "habitual sex offender." Hall then asked A.Z. why it took her so long to come forward with these allegations against him? Hall also told A.Z. that he was "sorry for everything that might have messed [her] up," including looking at her in the shower, but that he has tried to live a godly life for a long time and that he did not remember ever grabbing or touching A.Z. in her "reproductive area." This was in addition to Hall telling A.Z., "If I did it, I don't remember it, and I'm very sorry." Hall further told A.Z. that he was not saying she was a liar, but that he did not remember ever doing any of the things that A.Z. was alleging he had done to her as a child except looking in on her in the

shower. Hall additionally stated that he "hoped [she] was healing," but that this "pretty much destroys [him]" and that "[y]our memory is your memory."

{¶ 93} Once this recording concluded, A.Z. was asked "what's going on" with the shower? To this, A.Z. testified that the shower curtain used at the Gilpin Apartments when she was 11 or 12 years old was clear, i.e., see through, and that Hall "would open the door and put his head in to watch [her] shower." A.Z. was also asked to explain the incident that occurred between her and Hall in the hotel room upon their return from a wedding in Annapolis, Maryland. To this, A.Z. responded and testified that when returning from that wedding that they stayed at a hotel room where a cot had to be brought in so that everybody could sleep in the same room. A.Z. testified that this cot was put "in between the two beds and [Hall] slept on the far end, and then [B.H.], and then me in the middle, and then [A.L.], and then [E.A.]," and that she "woke to [Hall] lifting the covers and putting his hands down my pants with [B.H.] sleeping right next to me."

{¶ 94} The state then requested to play for the jury yet another April 18, 2019 telephone call between A.Z. and Hall. However, prior to this recording being played to the jury, Hall requested a sidebar conference, during which Hall initially stated:

> Judge, I – I don't want to disrupt the trial too much, but I do – am compelled to make the record. We just heard some testimony about this Annapolis and she says she was in a hotel room.
>
> This is, one, outside the indictment period, which gets to the issue of we can't uncure the taint on charges that are going to be – we've all acknowledged they're going to be dismissed by a Rule 29 because the introduction of this testimony is not being done in a context of 404(b) at this point. It's still being done as a case in chief as it relates to [A.Z.].
>
> This is direct testimony that's being introduced to try and prove that criminal conduct was committed by [Hall] against [A.Z.]. The context by which like and similar conduct would be introduced against the [E.A.] counts is a different situation. That – that's the whole problem with the incurable taint, Judge.

{¶ 95}    The trial court then responded and stated:

That's fine.  I mean, obviously we're still in it, the prosecution's case in chief.  There has been no Rule 29 made.  It's not timely at this point in time.

So there's no charges – none of the counts have been dismissed, other than those nulled at the beginning of the case. So I would expect the prosecution to proceed with their case in chief.

{¶ 96}    The trial court also stated:

Had – had this been any other situation – any other situation where you have a situation where it ends up that the evidence doesn't quite fit and the Judge would end up ultimately granting a Rule 29 at the end of the State's case, we wouldn't have these disruptions.

It's only because we were all kind of surprised to learn yesterday that the – the definition of sexual conduct was different back then.

So, I mean, I – it's not – this shouldn't' be treated any differently than any other case where we allow the State to present their case, and then at the end of the State's case, if they have failed to establish, even looking at the evidence most strongly in their favor, that they can establish the elements of the charges, then the Court grants a Rule 29.

{¶ 97}    Once this sidebar conference concluded, a third telephone call between A.Z. and Hall on April 18, 2019 was played for the jury.  During this telephone call, which lasted eight minutes and 50 seconds, Hall told A.Z. that he had to "process through" what A.Z. and E.A. were claiming he had done to them as children.  Hall also told A.Z. that it was "not fun" for him to have someone accuse him of something "like that."  Hall then again asked A.Z. why she did not come forward earlier because he "remembers things a lot differently" than what A.Z. was claiming?  Hall also asked A.Z. if "anybody else" was accusing him of anything?  Hall further asked A.Z. if, "in all fairness," it was possible that neither his memories nor her memories were "perfect?"  Hall additionally asked A.Z. if he

was "awake" when he was touching her? To this, A.Z. responded indignantly and forcefully told Hall that she did not know because she was a just a "child." Hall then stated that he had never known A.Z. to lie, which is what "really scares [him]."

{¶ 98} A voicemail that Hall left for A.Z. on April 18, 2019 was then played for the jury. During this voicemail, which lasted one minute and 56 seconds, Hall stated that if A.Z. believed something happened to her when she was a child that he would "respect that." Hall also stated that he "respected" A.Z.'s bravery and thanked A.Z. for coming forward. A.Z. testified that following these telephone calls, and upon receiving Hall's voicemail, Hall also sent her several text messages and e-mails. One of those text messages, as A.Z. testified, included Hall stating the following:

> You are very brave. I'm sorry for all the hurt I have caused. I want to talk with [B.H.] I will not until you're comfortable. If [E.A.] alone had said those things, I would not have believed her. But I have never known you to lie or hurt someone just to do it.

{¶ 99} The state then played for the jury a recording of another telephone call between A.Z. and Hall that occurred on April 20, 2019. During this call, which lasted 14 minutes and one second, Hall claimed that he was going to start writing down his memories of what A.Z. and E.A. had alleged he had done to them as children. Hall also claimed that he "wanted to recall what [he] could recall" because the mind can be lead astray and manipulated by "mental cues." Hall further claimed that this was "not about [him]," but that it was all about A.Z. and E.A. being able to heal. Hall then told A.Z. that his actions have already made two "victims," and that he was talking to one of them on the telephone right then, "so how in the world do I want to leave a trail of additional victims?"

{¶ 100} Hall also stated during this telephone call that if it had just been A.Z. that had come forward that he would have thought she was "full of crap," but that because it was both A.Z. and E.A. making similar claims that he "has to look at [himself]." Hall then

told A.Z. that he was going to "journal" so that he could "figure out what [he] can figure out," but that crimes are generally "crimes of opportunity," which is one of the reasons why he does not change his grandchildren's diapers. Hall concluded this call by telling A.Z. that he was going to write her a letter setting out his "memories" and that he would have that letter to her by the following week. A.Z. testified that she then received a group text message between herself, E.A., and Hall, wherein Hall stated, in pertinent part, the following:

> I had a long and good talk with [A.Z.], and I want you to know that I love you both very much and I am so sorry. * * * It is not necessary for you to go into any explanations, I will be working with [A.Z.] in the coming days and weeks to make sure that whatever I do is done in accordance to what we all agree is the right and proper thing to do.
>
> [B.H.] knows nothing, and I would prefer to keep it that way until it is the right time. No one deserves to suffer. Especially not family. For that I am deeply sorry. I will be sending a letter to [A.Z.] sometime next week. Probably via email. I just hate to see [B.H.] suffer.
>
> Finally, I prefer not to hear any more information. I will be spending the coming days writing down my recollection of everything. Memory is a funny thing, and I've never had a great one. So I prefer not to have anything clouded up any worse than it already is.

{¶ 101}   A.Z. testified that she received another text message from Hall on April 25, 2019, wherein Hall stated, "[l]etter coming hopefully tomorrow via email pdf attachment. Copy being given to [A.L.] a few days later. Nothing to [B.H.] I hope it helps." A.Z. testified that the following day, on April 26, 2019, she received an e-mail from Hall. Hall stated in this e-mail, which was admitted into evidence without objection, that he had written a letter to A.Z. that he would be sending to her shortly. Hall also stated in this e-mail the following:

> This is going to sound really selfish, but I am happy this has happened. I am scared for sure, and will address that in great depth but the price of being free from the past and hoping for a better future is paid, and I didn't pay that price. You know who did. He hung on a cross.

{¶ 102}   A.Z. testified that she received another e-mail from Hall on April 27, 2019. Hall stated in this e-mail, which was also admitted into evidence without objection, the following:

> I'm rethinking some things.  Do you mind telling me what you prefer?  In other words do you want a written recollection of my memories specific to you alone?  I prefer to deal with this a little differently.  I wrote and scanned a letter.  But fear and doubt are winning the day right now.  I'm suffering from fleeting courageousness.  Please let me know your thoughts.

{¶ 103}   A.Z. testified that she responded to Hall's e-mail and stated:

> I would appreciate seeing what your memories are.  Like I said when we spoke, I want to start moving forward and healing.  I understand this is the hardest thing you've probably had to do, but remember I've been dealing with it for over 25 years and it took a lot of courage to talk to you about it.

{¶ 104}   A.Z. testified that Hall responded to her e-mail and stated:

> Absolutely.  You are very courageous and I'm proud of you for that.  Thats (sic) very fair.  I haven't quit the project, just needed to put it down for the day.  I'm sorry you have bore this burden this long [A.Z.]  I will work on it soon.

{¶ 105}   A.Z. testified that she received another e-mail from Hall two days later, on April 29, 2019.  In this e-mail, Hall, recounting his "memories" of the sexual abuse he perpetrated on A.Z., stated the following:

> While we were living in the [Gilpin Apartments] I entered your room lifted your shirt and touched you.  It happened one time that I can remember.  I did not touch you below the waist.  It seemed to have been maybe two or three minutes in total.  I thought you were dead asleep.  I am very sorry, ashamed and I ask your forgiveness.  What was I thinking?  I don't know.

{¶ 106}   Hall also stated in this e-mail:

> I forgot about the shower curtain until you reminded me.  I did, in fact, look under the threshold while you were in the shower but couldn't see anything.  Incidentally I am extremely near sighted so without glasses or contacts it would be a blur likely anyway.

{¶ 107} Hall further stated in this e-mail:

> One time on Market I guess I was sleep walking and I think you called my name "DAD!" and I left and went back to bed.
>
> One time on Eyler I was checking on the dogs in the back, and you had your lights on in your bedroom and were dressing and I looked but then looked away embarrassed.

{¶ 108} Hall additionally stated in this e-mail:

> I think that's everything. If your memory is different, I am not going to challenge that. I wish none of it ever happened. I wish a lot of things were different for myself and for you and especially for [E.A.] The incident with her is about the same scope as yours but I will deal with that later. It was a single event as I recall. On Fairway. That's the end of my memories.

{¶ 109} Hall then stated in this e-mail that he had never "tried to look at or in any way act inappropriately around" his biological daughter, A.L. Hall then stated, "Why the difference? It's impossible to describe but there simply was no curiosity or temptation." Hall further stated in this e-mail the following:

> If we can get through this and if we can heal and if you can forgive and if you will allow me to [be] part of your life and if you will let me see my grandkids I can tell you that we will put physical steps in place so you feel assured that they are protected.

{¶ 110} A.Z. testified that a few days after receiving this e-mail, on May 3, 2019, she received one final text message from Hall. In this text message, Hall stated that he was "interviewing therapists" and that he "would expect to start pretty soon." Hall also stated that he was "trying." A.Z. and the state then had a lengthy exchange in which A.Z. testified and reiterated that, yes, Hall had sexually abused her from the time she was 12 years old up to and included when she was attending high school, that Hall had sexually abused her on multiple occasions, and that she did not feel like she could tell anyone or report what Hall was doing to her because she "felt ashamed and embarrassed" and "didn't know how or who to tell." A.Z. also testified during this exchange that, no, she did not ever

want anyone to find out about Hall sexually abusing her as a child because she "just wanted to move on and live a normal, happy life." A.Z. further testified during this exchange that she was "afraid" that she would lose her family if they found out about Hall sexually abusing her. This was in addition to A.Z. testifying the reason she finally decided to report Hall to the police was to "protect" A.L.'s two children because, although she feels like she can protect herself now, "[she] need[s] to protect them" given that "[she] couldn't protect [herself] as a kid."

{¶ 111} The state then concluded its direct examination of A.Z. and the trial court recessed for lunch. Following the trial court's lunch recess, the trial resumed with Hall's cross-examination of A.Z. During A.Z.'s cross-examination, Hall questioned A.Z. about a litany of topics. This includes, among things, questions regarding the manner in which A.Z. got the "ball rolling" with the investigation into her allegations against Hall; several photographs depicting A.Z. with Hall and B.H. during loving, family moments like when A.Z.'s husband, M.Z., asked A.Z. to marry him while at Hall's and B.H.'s house in 2003; and why A.Z. left out certain, specific details in her written statement outlining her allegations against Hall that she had provided the Springboro Police Department. This also includes questioning A.Z. about why she did not "run" to her mother's house that was "a stone's throw" away rather than endure Hall's alleged sexual abuse, why A.Z. did not tell anybody that Hall was sexually abusing her during Hall's and her mother's divorce proceedings, and why the teacher that A.Z. claims she reported Hall's sexual abuse during her sophomore year of high school, N.J., did not report A.Z.'s allegations despite N.J. being a "mandatory reporter."

{¶ 112} Following Hall's cross-examination of A.Z., the state conducted a brief redirect-examination of A.Z. At the conclusion of this redirect-examination, the following exchange between A.Z. and the state occurred:

[THE STATE]: You – you touched on this a little bit ago, but is there a struggle going on inside you about this love – you love [Hall] and the struggle with the abuse that occurred?

[A.Z.]: Absolutely. I mean, I do still love [Hall]. I have a lot of guilt right now for even having to say something about it 'cause I don't – I – I don't want to be in trouble, but I didn't – I can't let [A.L.'s] kids be hurt [by Hall]. It's hard to explain. I love my dad. I don't like what he did to me. Finding out about [E.A.] is terrible and I can't let it happen to someone else.

Hall then asked A.Z. a few more questions on recross-examination, which was then followed by questions from the jury. A.Z. was then excused as a witness.

{¶ 113} Due to a scheduling conflict, the next witness to testify, Dr. William Ralston, was called by Hall as an expert witness in support of his defense. Dr. Ralston, a board certified forensic pathologist, testified that based on his review of A.Z.'s and E.A.'s medical records available to him there was no physical evidence to support A.Z.'s and E.A.'s allegations that they had been sexually abused by Hall when they were children. Dr. Ralston also testified that he did not find any evidence with A.Z.'s and E.A.'s medical records that would lead him to believe either A.Z. or E.A. had been subject to a "sexual assault or rape" at any point during their lives. On cross-examination, however, Dr. Ralston acknowledged that he had not conducted a physical examination of either A.Z. or E.A. Dr. Ralston also acknowledged that he had not reviewed any documents except for A.Z.'s and E.A.'s medical records. This includes Hall's e-mails, text messages, and telephone calls to A.Z. and E.A., as well as any of the various police reports generated in this case.

{¶ 114} Turning back to the state's case-in-chief, A.Z.'s mother, S.H., testified. S.H. testified that she met Hall while she and A.Z. were living in Jacksonville Beach, Florida when A.Z. was four years old. S.H. testified that as her relationship with Hall became more serious, she and A.Z. moved from Florida to Ohio where Hall was originally from and where all of Hall's family still lived. S.H. testified that after she and A.Z. moved to Ohio with Hall,

she and Hall were married, Hall adopted A.Z., and S.H. gave birth to Hall's only biological child, A.L. S.H. testified that following A.L.'s birth she and Hall moved into a home on Woods Road in Springboro, Warren County, Ohio with their two children, A.Z. and A.L.

{¶ 115} S.H. testified that prior to her divorce from Hall she "noticed one episode" between Hall and A.Z. that she found unusual. Describing this episode, S.H. testified:

> I had woke up one night and [Hall] was not in bed. So I went looking and he was just sitting on the side of the – side of [A.Z.'s] bed, just looking at her is all I could see. I – I didn't see anything else.

S.H. testified that she then asked Hall what he was doing in A.Z.'s bedroom while A.Z. was asleep. S.H. testified that Hall responded to her and said, "it was displaced affection, and there was nothing wrong with that."

{¶ 116} S.H. testified that following her divorce from Hall she and Hall were awarded shared parenting that split custody of their two children, A.Z. and A.L., right down the middle, three-and-one-half-days each week. S.H. testified that after her divorce from Hall she stayed at the house on Woods Road, whereas Hall moved into an apartment at the Gilpin Apartments, followed by a house located on Market Street and then to a house on Elyer Drive. S.H. testified that A.Z. "never said anything" to her about Hall sexually abusing her as a child until just a few years earlier, which S.H. testified occurred sometime in 2017. When asked if she ever made a "report to anyone" after A.Z. first told her about Hall sexually abusing her as a child, S.H. testified that, no, she did not. S.H. instead testified that "[A.Z] had told [her] that she was gonna do that" after both she and A.Z. became "very concerned" about A.L.'s two children "because the children were over with [Hall and his wife, B.H.] quite a bit" when A.L. needed a babysitter.

{¶ 117} Hall then began his cross-examination of S.H. As part of this cross-examination, Hall asked S.H. several questions about their divorce. Following Hall's cross-

- 40 -

examination, the jury then asked S.H. two questions, one of those questions asked S.H. if she, as a mother, had ever noticed any hesitancy from A.Z. when it was time for A.Z. "to go to dad's house for three days[?]" To this, S.H. testified that she "didn't really notice anything" at the time, but that "after [she] heard about what had happened, you kind of look back and you think, oh, so maybe that's why she's – you know, acted the way she did or – you know, something like that if –" S.H. also testified that after A.Z. "told [her] something had happened to her, you kind of look back and you think, maybe that's why she acted the way she did or dressed the way she did or did different things." S.H. was then excused as a witness and day two of trial came to an end.

*Day 3: Testimony and Evidence*

{¶ 118} The third day of trial began with E.A. taking the stand. E.A., who the record indicates is an accomplished, award winning real estate agent specializing in the sale of luxury homes in Arizona, is B.H.'s biological daughter, thereby making her Hall's step-daughter and A.Z.'s and A.L.'s stepsister. E.A. testified that she grew up in the Springboro, Warren County, Ohio area and graduated from the local high school in 2001. E.A. testified that her mother, B.H., met Hall in the laundry room of the Gilpin Apartments after Hall's mother, E.H., introduced B.H. to Hall when E.A. was ten years old. E.A. testified that following this initial introduction that B.H. then began dating Hall. E.A. testified that this upset her and that she "didn't really like" her mother dating Hall because of "the vibes" that Hall was giving off to her. Specifically, E.A. testified when asked how she initially viewed B.H.'s and Hall's relationship:

> Yea, I was upset. I was upset about it and I didn't really like the vibes he was giving to me. There was a lot of – I was told like this family likes to hug. That was something I was not used to and he was always wanting to hug me and give me attention and that made me uncomfortable.

{¶ 119} E.A. testified that she raised her concerns regarding Hall to her mother,

B.H., but that her mother "downplayed it," told her that Hall was "an affectionate guy," and said she "just wasn't used to normal relationships" that included "public displays of affection," which E.A. testified "grossed [her] out." E.A. testified that her mother also told her that she was "being overdramatic." E.A. then testified her mother had told her that she needed to be friends with Hall's two children, A.Z. and A.L., because they could "potentially" become her stepsisters if she and Hall got married, something that E.A. testified her mother and Hall did in the November of 1994 when she was 11 years old. E.A. testified that this was "stressful" and "kind of strange" for her because she "was an only child and not really used to the thought of thinking about having siblings." Because of this, E.A. testified that, when looking back, her relationship with A.Z. and A.L. was, at that time, "okay at best."

{¶ 120} E.A. testified that her mother and Hall then moved into a house "on Market that they lived in for a little while, and then he purchased the house on Eyler Drive" that she, A.Z., and A.L. all "eventually moved into." E.A. testified that it was "very tough," she was "very sad," and "just not happy with the situation" when B.H. married Hall. However, although not happy, E.A. testified that B.H. "made it clear" that "she was [her] guardian," that "she had the say," and that her getting married to Hall was "what [they] were doing." Thereafter when asked to describe the escalation that occurred with Hall touching her following Hall's marriage to her mother, E.A. testified:

> Well, when I moved into Eyler Drive, I don't necessarily remember like escalated touching in the beginning, but there was just times where I was like finding him in my bedroom at night and he was wandering around in the house in the dark and I was concerned about that.

{¶ 121} E.A. testified that she mentioned the fact that Hall was in her bedroom at night to her mother, but that B.H. "made excuses" for Hall and said "he's checking on security and dogs," none of which made sense to E.A. when considering she "was seeing [Hall] in [her] room." Explaining further what she remembered about Hall being in her

bedroom, E.A. testified:

> Yeah, there would just be times I would wake up and he would be in my room. And that was around the time that I was reporting to [B.H.] I was having instances where I'd wake up in the morning and I'd have no clothes on or different clothes on than I went to bed, usually less articles. And I – I found that really strange.

{¶ 122} E.A. also testified that she "couldn't figure out really what was going on," but that B.H. would tell her that she was "just getting hot in the middle of the night and taking off clothes." However, although that was what B.H. told her was likely going on, E.A. testified that she "wasn't remembering that to be the case" when considering there were mornings when she would wake up with "pain" in her lower abdomen, her back, and "sometimes in [her] vagina." E.A. further testified that, as a 12-year-old girl, having Hall come into her bedroom in the middle of the night made her "[v]ery scared," "uncomfortable," "worried," and anxious to the point where she was nauseous, getting sick, and throwing up. But, even then, E.A. testified that she neither said anything to Hall when she found him in her bedroom at night nor did she ever scream. E.A. testified that she would instead voice her concerns to her mother, B.H., and tell her mother that she "thought things were going on" and that she "wasn't okay with that."

{¶ 123} E.A. then testified about a specific incident that occurred at the home on Eyler Drive in the summer of 1995 when she was 12 years old prior to her starting her menstrual cycle. Asked what happened when Hall came into her bedroom on that particular night, E.A. testified that she believed Hall had "raped" her because when she "woke up the next morning, there was blood on [her] sheets and [she] was very scared and upset and in pain." Shortly thereafter, when asked to describe the specific acts that occurred, E.A. testified, "I remember seeing Mr. Hall in my bedroom, [Hall], and I saw his penis and he put his penis inside of my vagina. I – I was assaulted. I was in pain. I was scared." The state

then explicitly asked E.A. if Hall engaged in vaginal intercourse with her on that particular night, to which E.A. testified, "Yes."

{¶ 124}   E.A. then testified that upon realizing Hall was having sexual intercourse with her that she "didn't know what to do" and that she was "paralyzed with fear." E.A. then testified about the manner in which she found her clothes when she woke up the next morning after being raped. As E.A. testified:

> Yeah, I did not have any pants on, any underwear and they were – I – I found that strange because they were my pants and – or the shorts I had to go to bed in, my underwear were like still together, like they had been slipped off of me together and just kind of placed down there beside the bed, which again, when [B.H.] was telling me I was taking my clothes off because I was hot in the middle of the night. I do not recall there were nights that I was doing that.

> But normally if I would take off like my pants, that I was – or shorts that I was wearing, I would not take off my underwear and I would kind of just like fling them – you know, to the middle of the room, like towards the closet. But that was not the case. These were more like neatly placed, something I did not remember doing.

E.A. also testified that when she woke up that morning she had pain in her vagina, her lower back, and her stomach. E.A. further testified that she had a headache and was "just feeling very, very stressed and tense." E.A. additionally testified that she was "upset," scared, and "confused" by what Hall had done to her and that she "didn't like living with him."

{¶ 125}   E.A. then testified about one particular incident that made her wonder if A.Z. was experiencing "something similar" to what had happened to her. Describing this incident, E.A. testified that once after school she and A.Z. rode the bus home together. E.A. testified that upon getting off the bus and entering their home, Hall was there, something that E.A. testified was unusual because "normally we would get home and it would just be the two of us, and then we'd wait for [A.L.] to get off the bus. She rode a different bus." Describing this incident further, E.A. then testified, in pertinent part, the following:

And I was instructed to stay in the living room to wait for [A.L.] to get off the bus. And [Hall] was acting very stern and was telling [A.Z.] go to her room. And then he went in there and they stayed in there for – it seemed like several hours.

And I got [A.L.] off of the bus and we stayed in the living room, and then [Hall] abruptly left and I assume like went back to work. But [A.Z.] came out of the room and she was just devastated, like the look on her face, I'll never forget.

It was – she had been crying. She was still crying and she had like – her nose running. And, of course, [A.L.] and I are asking her like, what's wrong?

E.A. testified that later that day she asked Hall what had happened between him and A.Z. that had caused A.Z. to become so upset. E.A. testified that she was "told that they were having a birds and the bees conversation, so like about sex education."

{¶ 126} E.A. then testified that although she was concerned Hall may have also been sexually abusing A.Z. she never told A.Z. that Hall had raped her in the summer of 1995. When asked why that was, E.A. testified that she and A.Z. "were not close," that she and A.Z. "were barely getting along, at best," and that "there was no trust between us and we fought a lot. We did not get along." E.A. also testified that because A.Z. was there only "part time" that "it was not a situation where I felt like she was someone that I could tell secrets to."

{¶ 127} E.A. testified that after living at the home on Eyler Drive she, her mother, B.H., and Hall, moved into a house on Fairway Drive in Springboro, Warren County, Ohio. E.A. testified that this move occurred in December of 1996 when she was 13 years old. E.A. testified that once she moved into the home on Fairway Drive Hall continued to creep around her bedroom at night. E.A. testified that this included incidents where Hall would stand in the hallway just outside her bedroom door. When asked if she had any specific recollections of when that occurred, E.A. testified, "Yes." E.A. then testified and described that specific incident as follows:

> There was a time that it was dark and I was in my room. I thought I was alone and I was touching myself under the covers. And I had a mirror across from the bed and I looked in that mirror and I saw [Hall] was standing in the doorway watching me, like breathing heavily.

{¶ 128} E.A. testified that she felt like this was an example of Hall "testing the waters" to see her "mannerism and patterns" of how she slept and what she slept in, "you know, what he could get away with." E.A. testified that this also included the "very invasive" questions Hall would ask her about her body, her "bathroom mannerism," and even her menstrual cycle, which E.A. testified Hall "took a lot of interest in that." Asked to describe what she meant, E.A. testified:

> Well, when I eventually started my menstrual cycle, I was at my aunt's house, I remember. And I'd called my mom to tell her that I had started my period. And I was embarrassed about it and didn't really want to talk about it. But I remember coming back to the house that day and [Hall] making comments that I felt like were gross, like congratulations. You're a woman now. And like wanting to talk about my body and I was just very uncomfortable. I was not wanting to have that conversation with anybody, let alone him.

{¶ 129} E.A. then testified about an incident that occurred one night in the summer of 1997 following her eighth-grade year when she was 14 years old. Describing this incident, E.A. testified that although she did "[n]ot necessarily" remember Hall coming into her bedroom that night, she did remember waking up, seeing Hall's face next to hers, and realizing that Hall was "on top" of her. When asked if she remembered the "specific acts that Mr. Hall engaged in that night," E.A. testified:

> Yes, having sex with me. He was on top of me, and at one point, his penis was inside my vagina. And then at one point, I remember he's sitting on the side of the bed and his pants are down, his penis is exposed and he has like a – some kind of towel, like a hand towel in his right hand and he's touching himself.
>
> And I'm wearing like a shirt and underpants. And he has his like left hand on my thighs and he's touching my vagina. His fingers

are going in my vagina. He's had to kind of like pulled my underwear to the side to have access to me.

{¶ 130} E.A. testified that while Hall was on top of her engaging in sexual intercourse that she "tried to act like [she] wasn't really awake." E.A. also testified that she was "trying to like – you know, hide." E.A., who testified she has asthma, further testified that while Hall was on top of her engaging in sexual intercourse with her that she was having a difficult time breathing, that her body felt "very like heavy and not able to move, kind of like paralyzed, paralysis feeling," and that she felt pain in her vagina and lower pelvic area.

{¶ 131} E.A. testified that upon waking up the next morning that she felt "very upset," "very sad and hopeless." E.A. also testified, "I felt like I just – what was he going to do? I wanted it to stop, but it wasn't working by what I was telling [B.H.]. And I – I just – I didn't know what to do. I was scared." E.A. further testified that she felt like her mother, B.H., did not do enough to protect her from Hall. When asked if she had those same feelings back then, E.A. testified, "[m]aybe at times, but not to the extent I really do now as an adult." E.A. also testified, "I loved her. I loved them. I was trying to be a good child. I was trying to make them happy, was trying to be a good Christian daughter."

{¶ 132} E.A. then testified about an incident that occurred in the fall of 1998 when she was a 15-year-old sophomore in high school. Describing this incident, which also occurred in her bedroom at the home on Fairway Drive, E.A. testified that she had a "specific recollection" of Hall engaging in sexual intercourse with her, seeing Hall on top of her, and feeling Hall's weight around her "midsection" and "hips." E.A. also testified:

> I did see [Hall's] face. I remember seeing his eyes because when I woke up, he looked surprised, startled. But he was sitting on the – at first, like his face was in mine. So he's like on top of me, but then I remember seeing him down towards the right side of that futon bed.
>
> And it – that was the time I felt like it was very hard to breathe. There was like sheets pushed up, kinda towards my face. And

I had a shirt on, but no pants, no underwear or anything, which again, was not what I would go to sleep in and –

{¶ 133} E.A. further testified that, just like when Hall had raped her in the summers of 1995 and 1997, she again felt pain in her vagina. E.A. additionally testified that she remembers having difficulty breathing that particular night. Specifically, as E.A. testified:

Yes. That particular night, I felt like I was struggling for breath. Again, the sheets were like more pushed up around my face. And I remember there – it felt like there was warm vapors in my lungs. It was a very strange feeling for me, but I was struggling to breathe there for a few minutes when I initially woke up and realized [Hall] was in my room.

{¶ 134} E.A. testified that she then remembers Hall sitting at the end of her bed, crouched down, with his pants down and his penis exposed. E.A. testified that she also remembers looking into Hall's eyes and making eye contact with Hall. E.A. testified that upon making eye contact with Hall that he looked "[s]hocked, like he was – you know, caught doing something wrong, maybe even a bit embarrassed, but –." E.A. testified that Hall then pulled down the sheets that had been pushed up around her face to cover her up, got up off of her bed, and walked out of her bedroom. E.A. testified that when Hall did this she could "hear him walking, like his ankles or knees," because "his joints were cracking" as he walked. E.A. then testified about the reasons she did not fight back against Hall or scream out when Hall raped her:

Just mainly intimidation and fear. I was just unsure of what to do. Again, in some ways, I liked my life. I didn't like it when my stepfather was assaulting me, but I felt like my life was decent. And I would think about reporting him and stuff, but I was just scared about would I have to go to foster homes. And just seemed like a bunch of scary stuff to deal with and I was just like wanting to graduate high school and try to be a good daughter.

{¶ 135} E.A. did testify, however, that on the day she graduated from high school in the summer of 2001 that she left a letter on B.H.'s dresser explaining that she was "not

going back to that house" and that she "was not going to live with them ever again." E.A. then testified that she did, in fact, not live with either Hall or B.H. again following her high school graduation. E.A. testified that she instead lived with a boyfriend for a couple of months, before "staying at family members' houses and friends and kind of just – you know, couch surfing around." But, as E.A. testified, this caused her "to worry about feeling homeless" because she had not yet secured a place to stay before starting college in the fall. E.A. testified that it was because of this, and because she was "basically homeless at the time," that she contacted her mother, B.H. E.A. testified that B.H. then allowed her to rent a condominium that she and Hall had recently purchased as part of their real estate business. E.A. testified that this was done so that she could "go to college and live – you know, semi-independently."

{¶ 136} E.A. testified that she agreed to B.H.'s offer to rent the condominium. E.A. testified, however, that living in that condominium ultimately did not work out for a multitude of reasons. Then, not being as successful with her studies in college as she had hoped, and in need of some financial stability, E.A. testified that she begrudgingly accepted B.H.'s offer to work at Hall's and B.H.'s real estate business. E.A. testified that this made her feel "obligated" to Hall and B.H. since they had provided her with a place to live and work that would allow for her professional advancement as a real estate agent.

{¶ 137} E.A. testified that she continued to work for B.H. and Hall at their real estate business for a period of ten years. E.A. testified that this was difficult for her having to spend time with Hall. However, despite these difficulties, E.A. testified that she was able to overcome these issues and "compartmentalized a lot, the work-family dynamic." E.A. also testified, "I felt like I was more in control of my life and since I wasn't sleeping at their house, I felt like – you know, that wasn't giving him the opportunity to assault me."

{¶ 138} E.A. testified that she stopped working for B.H.'s and Hall's real estate

business in the fall of 2012 and subsequently moved to Arizona in 2014. Explaining why she moved to Arizona, E.A. testified, "[w]ell, I told everybody just because we wanted a change of scenery and I wanted to get into the luxury market, but really it was to get away from [Hall] and [B.H.]" Then, when asked if she felt like B.H. and Hall were too involved in her life, E.A. testified:

> Yes. I stopped talking to them for a time when I stopped working on their team, and then we were kind of – [B.H.] and I were having a relationship again, but it was very strained and they were just very controlling and not respecting my boundaries that I was trying to set for myself and my relationship with my boyfriend, now my husband.

E.A. did testify, however, that she had occasionally come back to Ohio for visits with her mother, B.H., but when she did she "locked the bedroom door" and "didn't sleep very well" because she "just felt like [she] needed to stay on guard at their house."

{¶ 139} E.A. testified that Hall and B.H. came to visit her in Arizona in December of 2018. E.A. testified that B.H. was "very adamant" about wanting to visit her in Arizona, which, up until that point, E.A. testified she had been able to avoid. E.A. testified that when B.H. and Hall were in Arizona that they went to dinner together where everybody was drinking. E.A. testified that during this dinner Hall, who E.A. testified got "pretty intoxicated," made comments that prompted her husband, A.A., to question how it was that Hall "had knowledge about [her] body and stuff of that sort." When asked what her reaction was to that revelation, E.A. testified:

> I was nervous because it was like reality for me that I was going to have to tell [A.A.] because at that point, he's not aware of what's going on, but there's something. But it's more like he's accusing me of keeping secrets from him about why does your stepfather act like he knows more about you than I do as your partner?
>
> So that – that was very – I was very devastated and just sad and trying to stall for time before I was going to have to tell [A.A.] what was going on.

{¶ 140} E.A. testified that shortly after Hall and B.H. left Arizona that she received a telephone call from her stepsister, A.L. Explaining what happened during that call, E.A. testified that she "lost it," "broke down," and told A.L. that she was "in a really bad spot." E.A. testified that she also told A.L. that "there's some things that I've been keeping a secret from you that I've been keeping a secret from [A.A.], from everybody that I need to tell you." E.A. testified that she then told A.L. that Hall "had raped [her] as a child" and that she "wasn't gonna keep it a secret anymore and –." To this, E.A. testified that A.L. responded and said, "I'm shocked. I'm numb. I don't know what to say to you. I'm sorry. I believe you. I need to get off the phone." E.A. testified that A.L. then hung up. When asked how she felt after speaking with A.L., E.A. testified that she felt "[a] little bit [of] relief to finally share with somebody." E.A. also testified that she was "appreciative of [A.L.'s] comment that she said that she believed me, but I was worried" about "what it was going to do to our family."

{¶ 141} E.A. testified that after speaking with A.L. she received a telephone call from her other stepsister, A.Z. Describing her conversation with A.Z., E.A. testified that she never told A.Z. any of the "specific details" of what Hall had done to her as a child. E.A. testified that she merely told A.Z. the same thing that she had told A.L. previously, i.e., that Hall had "raped" her as a child. E.A. testified that this included no mention of the dates, times, or locations where she alleged Hall had raped her. E.A. testified that she merely "used the word rape." E.A. testified that A.Z. also did not share any "specific facts about her experience" of being sexually abused by Hall, either.

{¶ 142} E.A. testified that following her conversation with A.Z. that she felt like she should report Hall to the police, and was "leaning towards that," but that it nevertheless took her a few months to take any steps towards reporting Hall to the police. To do this, E.A. testified that she first called the Ohio Attorney General's Office to "see if they could help

[her] get in touch with somebody" that would not know Hall, or be affiliated with Hall, given that Hall had always said he was "associated with the Warren County Sheriff" and "had some card in his wallet he's always showing" and "talking about going to parties" at the Warren County Sheriff's house.[3]   E.A. testified that upon contacting the Ohio Attorney General's Office that she was directed to a victim advocate.  E.A. testified that the victim advocate told her that she "would need to report to the police of the jurisdiction where the first incident happened, which was on Eyler Drive in Clearcreek Township."

{¶ 143}   E.A. testified that she then called the Clearcreek Township Police Department and spoke with a detective there, Detective Barton.  E.A. testified that after speaking with Detective Barton that she e-mailed a statement she had written, "in paragraph form," describing "the instances" that she remembered "of the abuse, the assault" to the Clearcreek Township Police Department.  E.A. testified that she sent this e-mail in March of 2019.  When asked, E.A. testified that she had worked on her statement, which E.A. testified spanned a total of seven or eight pages, for approximately one day prior to e-mailing it to the Clearcreek Township Police Department.

{¶ 144}   The trial court then notified the jury that it would be recessing for lunch and excused the jury from the courtroom.  Once the jury was out of the courtroom, the trial court asked the parties if there was anything else that needed to be put on the record.  Hall responded and notified the trial court that he had filed a written motion for mistrial that morning while E.A. had been testifying on direct examination.  To this, the trial court noted that it "will rule on that" even though it "seems like it's redundant and already been ruled on."  The trial court then stated, "[b]ut until we get to that point in the case, there's certainly no prejudice to [Hall] in continuing on at this point in time."  Hall then responded and stated:

---

3. The record indicates that prior to A.Z.'s and E.A.'s allegations arising that Hall was an appraiser for the Warren County Sheriff's Office.

Yeah, I – I think so, but I think the fundamental essence of our argument is the – the standards for admissibility under a 404(b) analysis versus a trial on an underlying criminal charge are vastly different. And that would have an impact on some of the testimony and evidence that you would have allowed in, which is what creates the – the irreparable harm and prejudice to the jury. But you've heard that before and you know our position.

The trial court then recessed for lunch and notified the parties that the trial would resume with the continuation of E.A.'s direct examination.

{¶ 145} After lunch recess concluded, E.A. testified and acknowledged that she had agreed to participate in a controlled telephone call with Hall that occurred on May 1, 2019. E.A. testified that there were no law enforcement officers physically present with her when that telephone call was made, nor were there any law enforcement officers directing her what to say to Hall during that telephone call. The telephone call between E.A. and Hall was then played for the jury. During this telephone call, which lasted 37 minutes and 36 seconds, Hall told E.A. that he was going to "write her a letter" just like he wrote a letter to A.Z. telling E.A. what his "memories" were. Hall then told E.A. that he "completely and utterly confess[es]" that "things happened that never should have happened." Hall then admitted to E.A. that he had "touch[ed]" her left breast "one time" for approximately "30 seconds" while E.A. was sleeping in her bedroom at the home on Fairway Drive.

{¶ 146} Hall also acknowledged that he had looked at E.A. for several seconds while E.A. was laying naked on top of her bed at the Fairway Drive home when E.A. had a "severe" sunburn. Hall denied, however, that he ever touched E.A. "below the waist" or "raped" her. Hall also told E.A., "I don't remember doing anything else. Period." Hall then told E.A. that he might have "multiple personalities or something," but that "your memories are your memories; my memories are my memories." Hall later told E.A. that he "can't believe" that he would have ever raped her, but that "God help me if your memories are right." Hall also said that "it would be wrong for me to challenge your memories [E.A.], it

- 53 -

just would."  Hall eventually concluded by telling E.A. that he was sorry for everything that he had done to her as a child, but that he did not want her forgiveness, he wanted her "mercy."

{¶ 147}   E.A. testified that once this telephone call concluded that she received an e-mail from Hall.  Hall stated in this e-mail, which the record indicates was admitted into evidence without objection, the following:

> Thank you for calling me.  I wish things were different but they are not and it maybe (sic) never be good again for you and me. I acknowledge your feelings and accusations yet your memory and mine really just don't align.  And from my perspective that is the source of the problem.  I wonder why you waited so long to accuse me?  I wonder why you would work beside me for so many years in light of such allegations?  Since we talked it through I see no need in reliving today's conversation.  I'm sure we will talk again.

{¶ 148}   Hall also stated in this e-mail:

> I will tell you exactly what I told [A.Z.] and that is I will be speaking with [A.L.] soon (probably this weekend) and then seeking professional help.  Today right after the phone call I made several connections to do just that.  In fact, if you find me a good one I will give them a call immediately.

> If you are right and I am wrong I don't want to know about it. That would be ridiculous.  I don't want any more outside influences on my memories.  Not yet.  Abuse and neglect can come in many forms and I in no way want to hinder your progress to heal.  I intend to do whatever I can to get to the bottom of it for you and [A.Z.]

{¶ 149}   E.A. testified that upon receiving this e-mail from Hall that she forwarded the e-mail to Detective Dunkel with the Springboro Police Department, whom E.A. testified she had already been in contact with at the time the controlled telephone call between her and Hall had occurred.  E.A. testified that since that time she continued to cooperate with the prosecution of the case against Hall.  E.A. testified that this included traveling from Arizona to Ohio for the purpose of testifying at trial.  Concluding her direct examination, E.A.

answered that she finally decided to report Hall to law enforcement for sexually abusing her as a child because she "needed to make everybody aware in [her] family about what [Hall] has done to [her] because [she is] concerned about [her] younger sister, [A.L.], whose children are young and vulnerable. And [Hall] and [B.H.] are their primary baby-sitters."

{¶ 150} The state then concluded its direct examination of E.A. and Hall began his cross-examination. On cross, Hall initially questioned E.A. about whether she had spoken to A.Z. about her trial testimony. E.A. testified that she had not. Hall then asked E.A. several questions regarding E.A.'s statement she provided to the Clearcreek Township Police Department. This included Hall questioning E.A. about the allegations she set forth in her statement that she believed Hall had drugged her so that she would "sleep more soundly" so that he "would have time to take advantage of [her]." Hall then asked E.A. about a report that she had made with the Springboro Police Department in 2008 claiming she and her then boyfriend now husband, A.A., had been "attacked" during which E.A. claimed to have been raped. After Hall asked E.A. this question, the trial court removed the jury from the courtroom.

{¶ 151} Once the jury was out of the courtroom, the trial court told E.A. that Hall was going to ask her whether she had made a "false rape allegation." To this, E.A. told the trial court that, "No," she had not made a false rape allegation. Based upon E.A.'s answer, the trial court told Hall that he would be permitted to question E.A. about the 2008 incident, but that it "would caution you very, very strictly right now that you will not be able to use any extrinsic evidence to impeach [E.A.] You will be stuck with whatever her answer is." Hall responded and noted that he was "good with that." Hall also noted that he was "satisfied" with the trial court's decision. The jury was then returned to the courtroom and Hall again asked E.A. about the 2008 incident involving her and her husband, A.A. E.A. responded and testified that she had made a report in 2008 claiming she had been "incapacitated" and

"hit with a stun gun" prior to being raped both vaginally and anally. E.A. also testified that she believed Hall was somehow involved in this incident.

{¶ 152} Hall then again asked E.A. about why she never reported Hall had raped her to her doctor or to her mother, B.H. To this, E.A. testified that she believed B.H. was "just as dangerous" as Hall and that without B.H.'s cooperation and cover up that Hall would never have gotten away with sexually abusing her for so long. E.A. additionally testified about her medical records, as well as the cards and gifts that she had given to Hall over the years for such things as Father's Day or Christmas. This line of questioning eventually led to E.A. testifying that she believed Hall and B.H. were trying to sabotage her life in Arizona so that she and her husband, A.A., would move back to Ohio and live with them.

{¶ 153} Concluding her testimony, E.A. stated on redirect examination that she felt "sad" seeing the old cards she had given to Hall and B.H. Asked why that was, E.A. testified:

> 'Cause I did love them. And that's why I didn't talk about it for so long 'cause I knew it was going to destroy our family and I loved our family ideally, how I thought it was and how I wanted it to be. And I tried to be such a good daughter and not talk about it and just act like it didn't happen.
>
> And I did mean those words. I loved them. I still do love them. But they've done a lot of things that were not right, [Hall] in particular, and [B.H.] covering up for him. And I just can't let other people get hurt like I was. He has to be stopped.

After E.A. answered several questions from the jury the trial court then excused E.A. as a witness. The trial court then recessed for the evening and the third day of trial came to an end.

*Days 4 and 5: Testimony and Evidence*

{¶ 154} The fourth day of trial started with Hall requesting the trial court be "mindful" that any testimony or evidence regarding the investigation into Hall started with A.Z.'s

allegations against Hall that formed the basis for Counts 1, 2, 3, 4, 5, 7, and 8, all of which the parties were anticipating would be dismissed by the trial court at the end of the state's case-in-chief. To this, the trial court informed the state "that questioning with regard to [A.Z.], I think at this time, would be inappropriate because we are now looking at using her – her testimony as 404(b) testimony, rather than as evidence towards the actual charges from the indictment[.]" The trial court also informed the state that it intended to dismiss those charges because it had not "heard anything that would fit the definition of sexual conduct with regard to those charges, so –" the trial court did not want "any questions about [A.Z.]" except for "foundational questions." The trial court further noted that "it's very clear that we're moving towards using this as 404(b)," but that it had not "ruled on that motion yet" and would do so "at the end of the [s]tate's case." The trial then proceeded with the state calling its next witness, Detective Barton.

{¶ 155} Detective Barton testified that it was his duty to investigate "all major crimes" within Clearcreek Township. Detective Barton testified that this included investigating allegations of child sexual abuse like those levied against Hall by A.Z. and E.A. Detective Barton then testified that he originally became involved in the investigation into Hall after he was presented with a statement from E.A. outlining Hall's sexual abuse against her when she was a child. Detective Barton testified that the investigation into Hall eventually merged into a joint investigation with the Springboro Police Department because some of E.A.'s allegations against Hall occurred in Springboro rather than in Clearcreek Township. Detective Barton testified that the investigation ultimately led him to Hall's residence where he participated in the execution of a search warrant of Hall's home with Detective Dunkel on May 3, 2019.

{¶ 156} Detective Barton testified that Hall was home at the time he and Detective Dunkel executed the search warrant. Detective Barton testified that he stayed outside with

Hall while Hall's home was being searched. Detective Barton testified that during the search of Hall's home, he and Hall entered his police cruiser with the intent of going to the Springboro Police Department where Detectives Barton and Dunkel would interview Hall. However, due to the manner in which the vehicles were parked in Hall's driveway, and because it was raining, Detective Barton testified that he was "blocked in" and "unable to get out of the driveway."

{¶ 157} Detective Barton then testified that Hall had made several statements to him while he and Hall were sitting and waiting in his cruiser, statements that, as Detective Barton testified, were recorded. The audio recording, which was 29 minutes and 37 second long, was then played for the jury. During this recording, Hall told Detective Barton that he believed the entire reason that law enforcement had come to his house was "[E.A.'s] doing" and that E.A. was a "whack-a-doodle" and a "hater." Hall also told Detective Barton that "whatever" A.Z. had told police that they could "take it to the bank."

{¶ 158} Once the recording concluded, Detective Barton testified that Hall was interviewed at the Springboro Police Department. Detective Barton testified that after the conclusion of Hall's interview he drove Hall back home. Detective Barton testified that he then returned to Hall's residence later that day to place Hall under arrest. Detective Barton testified that upon his arrival back at Hall's residence both Hall and Hall's wife, B.H., were present. Detective Barton testified that as he was placing Hall under arrest Hall "stated to his wife, [B.H.], this is something that was over 20 years ago."

{¶ 159} The next witness to testify was Detective Dunkel. Detective Dunkel testified that his investigation into Hall began after he received a telephone call from an officer in South Carolina who had spoken with A.Z. about her allegations against Hall. Detective Dunkel testified that this then led him to receiving a statement from A.Z. setting forth her allegations against Hall. Detective Dunkel testified that upon receiving this statement he

continued investigating the allegations A.Z. had levied against Hall. Detective Dunkel testified that this included setting up the telephone calls between Hall and A.Z. that were originally played for the jury on day two of trial. Detective Dunkel testified that this also included gathering e-mail and text messages that referenced the fact that Hall was "preparing to write a letter indicating his involvement of what the allegations were." Detective Dunkel testified that this ultimately led him to conduct a search of Hall's home with Detective Barton on May 3, 2019.

{¶ 160} Detective Dunkel testified that both Hall and Hall's wife, B.H., were present when the search of their house occurred. Detective Dunkel testified that he had provided Hall his *Miranda* rights prior to speaking with him. Detective Dunkel testified that upon contacting Hall that he asked Hall to go with him back to the Springboro Police Department for an interview. Detective Dunkel testified that Hall agreed. Detective Dunkel testified that he then accompanied Hall upstairs so that Hall could change clothes. Detective Dunkel testified that as they walked up the stairs Hall "indicated that what we are looking for is located in the trash bin or shredder, that which was a letter that we're looking for was found in the shredder." Detective Dunkel testified that he then looked inside the shredder waste bag and found "an intact letter" that Hall had written to A.Z. and E.A.

{¶ 161} Detective Dunkel then identified the letter that he had found in the shredder waste bag as State's Exhibit 1. Detective Dunkel testified that no other letters to A.Z. and E.A. were found during the search of Hall's home besides the letter found in the shredder waste bag. Hall stated in this letter, which was admitted into evidence without objection, the following:

> In 1993 and in 1996 or so, I physically touched [A.Z.] (93) and [E.A.] (1996ish) on one occasion each. It was <u>inappropriate touching and I am very sorry.</u>
>
> On a couple occasions I saw [A.Z.] and [E.A.] partially

undressed.

{¶ 162}   Hall also stated within this letter:

No one should have to harbor fear, anger or any other emotion for simply being a victim.

[E.A.], Thank you for the courage to share this with [A.Z.], and [A.Z.] thank you for the courage to call me.

I am reaching out for your mercy, and not expecting forgiveness. <u>I am not going to second-guess your memories either, or diminish them in any way.</u>  That is why I will be penning three much longer letters as I am able.

I am hopeful that God will <u>restore us as a family one day.</u>

{¶ 163}   Hall concluded this letter by stating:

I am powerless to change one moment of the past, can't predict the future, so I pray for the present.

We were a happy family most of the time, right?

{¶ 164}   The video recording of Hall's interview with Detective Dunkel and Detective Barton at the Springboro Police Department was then played for the jury.  During this video recording, which lasts approximately 50 minutes, Hall noted that he had already provided the police with his "confession" and "love letter to his daughters," that they found in the shredder waste bag during the search of his home.  Hall also stated that A.Z., "the honest one," his adopted daughter, "does not lie," "if she says it, she means it," but that E.A., his stepdaughter, is a "whack-a-doodle" who cannot be trusted to tell the truth.  Hall stated that he believed this to be the case when considering E.A. had already made a false allegation of rape once before in 2008 when E.A. claimed to have been "gang raped" by a group of "thugs" or "mafia people" at the condominium that she was renting from him and B.H. at that time.

{¶ 165}   Detective Dunkel testified that once Hall's interview at the Springboro Police Department concluded that he drove back to Hall's residence where "they were

- 60 -

continuing to do the search warrant or still working on the search warrant on the residence." Detective Dunkel then testified that after consulting with the prosecutor's office the decision was made to place Hall under arrest. Detective Dunkel was then cross-examined, during which time he was questioned about the investigation of Hall. Detective Dunkel was also questioned about the report E.A. made in 2008 claiming she had been raped, a report that Detective Dunkel testified was ultimately determined to be "unfounded." Detective Dunkel then answered several other questions related to his investigation of Hall before being excused as a witness. The state then rested and moved for the admission of its exhibits, the majority of which were ultimately admitted into evidence without objection.[4]

{¶ 166} Once the discussion regarding the state's exhibits concluded, Hall moved for a Crim.R. 29(A) motion for acquittal on Counts 1, 2, 3, 4, 5, 7, and 8 related to his alleged sexual abuse of A.Z. To support this claim, Hall argued that "the definition that was not met, legal definition of penetration by a penis." The state agreed that "there was a change in the law" regarding the definition of "sexual conduct" that limited it to "vaginal intercourse, anal intercourse and two forms of sexual oral intercourse." Because of this change in the law, the state noted that it did not "really have a good argument" and agreed that "the testimony – that [A.Z.] does not meet that standard." Upon hearing this, the trial court granted Hall's Crim.R. 29(A) motion for acquittal on Counts 1, 2, 3, 4, 5, 7, and 8 related to Hall's alleged sexual abuse of A.Z.

{¶ 167} In so holding, the trial court initially stated that, "[t]he Court finds that the testimony of [A.Z.] related solely to digital penetration, and that all of the offenses relating to her occurred prior to July 1st of 1996." The trial court then stated:

> There are no allegations concerning [A.Z.] post that date. It's

_____

4. We note that Hall did initially object to the admission of State's Exhibits 9, 10, 14 thru 17, 20, 26 thru 28, 43, 44, 51 and 55. However, as the record indicates, Hall later withdrew his objections to those exhibits. *See* Trial Transcript, T.d., 32, p. 1125 and 1126.

clear that the definition of sexual conduct, which is alleged in all of those counts that have been moved by the defense to be dismissed deal with digital penetration only. And, therefore, they do not – they do not satisfy the legal definition of sexual conduct as alleged in the indictment for rape or sexual battery. So, therefore, Counts 1, 2, 3, 4, 5, 7 and 8 will be dismissed.

{¶ 168} Following its decision on Hall's Crim.R. 29(A) motion for acquittal, the trial court then denied Hall's motion for a mistrial previously filed with the trial court on the morning of the third day of trial. In so holding, the trial court stated:

At this time, and again, the Court has obviously struggled with this this week and – and, again, in – there – there's several different ways that I can look at it.

I believe that – that allowing the State – again, if I look at it, that I grant your motion and we come back and we try this case again, the Court believes that the – the next jury is going to hear the exact same testimony, only in – in a 404(b) context versus the – those additional counts from the indictment.

So I – the Court believes that I would be in the exact same position, just with a different jury at that time. I don't think that at this point it time, there's been any demonstration that the prejudicial effect outweighs the probative value. Clearly prior acts, other acts are permitted under evidence rule 404(b).

So, at this time, the Court is going to deny your request for a mistrial.

{¶ 169} Upon denying Hall's motion for a mistrial, the trial court then recessed for lunch. After returning from lunch recess, the state formally rested and moved for the admission of its exhibits. Once this happened, the trial court addressed the jury and stated, "All right. Thank you. All right. Ladies and gentlemen of the jury, I need you to pay close attention right at this moment." The trial court then instructed the jury as follows.

The Court has withdrawn from your consideration Counts 1, 2, 3, 4, 5, 7 and 8. You are not to speculate as to why the Court has withdrawn them. Evidence relating to those counts was received about the commission of other acts, other than the remaining offenses with which [Hall] is charged in this trial, specifically the allegations made by [A.Z.], that evidence was allowed for a limited purpose. It was not received and you may

not consider it to prove the character of [Hall] in order to show that he acted in conformity with that character in this case with the remaining charges.

If you find at the close of the case that the evidence of the other acts is true and that [Hall] committed them, you may consider that evidence only for the purpose of deciding whether it tends to prove [Hall's] motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{¶ 170} For the remainder of trial, Hall proceeded with his defense case-in-chief by calling an additional five witnesses. These witnesses included A.Z.'s high school chemistry teacher, N.J., Hall's biological daughter, A.L., Hall's sister-in-law, C.H., and Hall's wife, B.H. Hall did not testify in his defense. As part of her testimony, B.H. testified that she never saw anything that would have been a "red flag" regarding how Hall treated A.Z. or E.A. when they were children. B.H. also testified that she did not see or hear anything that she felt was "unusual" with Hall. B.H. further testified that she did not see any "signs of any distress or anything" with A.Z. or E.A.

{¶ 171} B.H. additionally testified that she did not see anything that would have led her to believe Hall was "sexually abusing" any child, including A.Z. and E.A. B.H. also testified that for E.A. to say the things she is now claiming that E.A. has "got some deep-seeded mental health issues that she needs to probably get addressed." B.H. testified the same was true as it relates to A.Z. Following B.H.'s testimony, Hall rested his defense case-in-chief and moved to admit his exhibits, of which all but two were admitted into evidence by the trial court without objection.[5]

**Closing Arguments and Final Jury Instructions**

{¶ 172} Once the discussion regarding the admission of Hall's exhibits concluded,

---

5. We note that Hall's two exhibits that were not admitted into evidence were A.Z.'s and E.A.'s written statements they had provided to the Clearcreek Township Police Department and Springboro Police Department.

the jury was returned the courtroom for the presentation of the parties' closing arguments.

During his closing argument, Hall maintained his original defense strategy that he introduced to the jury as part of his opening statement. That is, Hall argued that the allegations levied against him by both A.Z. and E.A. were false and that, while he did admit to having "sexual contact" with A.Z. and E.A by inappropriately touching them both one time when they were children, he had never engaged in "sexual conduct" with either A.Z. or E.A. as was alleged. This includes Hall stating, in pertinent part, the following:

> [Hall] has never admitted rape. He's admitted bad things. Touching is not good. It's not acceptable. It is violation of law. But that's not what he's charged with. Sexual conduct does not include touching.

This also includes Hall claiming that A.Z.'s and E.A.'s claims "[d]id not happen," that A.Z's "memory" of what happened "was wrong, or worse, she lied," and that E.A. is a "whack-a-doodle," "delusional," "unbelievable," and "mentally ill."

{¶ 173} Hall further stated during his closing argument the following as it relates to the manner in which the jury could consider A.Z.'s testimony:

> Now, got to talk to you a little about – this is what we call evidence Rule 404(b). It's in your instructions as alleged other acts. It's important that you pay strict attention to that rule and here's why.
>
> It is a very, very limited instruction on what you're allowed to consider it for, and this relates to [A.Z.'s] allegations. You may only consider that evidence for a very limited, narrow purpose that relates to – not character, not character. You cannot use that information to say, because [Hall's] admitted to two – two illegal acts that he's not charged for, that that means he committed rape. You cannot do that.

{¶ 174} Hall also stated:

> You're only allowed to use [A.Z.'s testimony] for that limited purpose of opportunity, plan, whether or not you think – and that requires you to get to the place of thinking that there's some truth, truth in what [A.Z.] says.

So you can't convert that belief that relates to [A.Z.] into a reason to find [E.A.'s] charges founded. In other words, to find [Hall] guilty because you've got to look at the independent evidence as it relates to [E.A.'s] claim.

The instructions lay that out for you, somewhat legalese. But when you look at it, I think that you will understand what that instruction means.

{¶ 175}   Once the parties' closing arguments were complete, the trial court provided its final instructions to the jury. That included the following instruction regarding the manner in which the jury could consider A.Z.'s testimony.

Evidence was received about the commission of other acts, other than the offenses with which [Hall] is now charged in this trial. Specifically, I am referring to the allegations of [A.Z.]

That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of [Hall] in order to show that he acted in conformity with that character in this case regarding the remaining counts involving [E.A.]

If you find that the evidence of other acts as alleged by [A.Z.] are true, and that [Hall] committed them, you may consider that evidence only for the purposes of deciding whether it proves [Hall's] motive, opportunity, intent or purpose, absence of mistake or accident, or preparation or plan to commit the offenses charged in this trial. That evidence cannot be considered for any other purpose.

{¶ 176}   The trial court then continued with its final instructions to the jury. This included the trial court instructing the jury on the changing definition of the term "sexual conduct" under R.C. 2907.01(A) to be used when deliberating on Counts 9, 10, 11, 12, 13, 14, and 15, the charges related to Hall's sexual abuse of E.A. that remained pending after the trial court granted Hall's Crim.R. 29(A) motion to dismiss the charges related to Hall's alleged sexual abuse of A.Z. set forth in Counts 1, 2, 3, 4, 5, 7, and 8.

**Jury's Verdict and the Trial Court's Sentence**

{¶ 177}   After the trial court completed its final jury instructions, the jury was then

released for deliberations. The record indicates the jury returned with a verdict finding Hall guilty on all remaining counts relating to his sexual abuse of E.A., Counts 9, 10, 11, 12, 13, 14, and 15, three hours and five minutes after being released. After announcing the jury's verdict, the trial court then scheduled the matter for sentencing on August 31, 2020. The trial court later rescheduled sentencing to take place on November 24, 2020.

{¶ 178} On November 24, 2020, the trial court held the previously scheduled sentencing hearing. At sentencing, the trial court merged Counts 9, 10, and 11 together, Counts 12 and 13 together, and Counts 14 and 15 together as allied offenses of similar import. The state then elected to proceed with sentencing Hall on Counts 9, 12, and 14, which effectively consolidated the offenses that Hall was being convicted into the 1995 rape of E.A. at the house on Eyler Drive in Clearcreek Township, Warren County, Ohio, and the 1997 and 1998 rapes of E.A. at the house on Fairway Drive in Springboro, Warren County, Ohio.

{¶ 179} Following the state's election, the trial court then proceeded with its sentencing decision and sentenced Hall to a mandatory term of life in prison. The trial court also designated Hall a sexual predator and notified Hall that he would be subject to a mandatory five-year postrelease control term if he was ever released from prison. Hall now appeals his conviction, raising six assignments of error for review.

**Hall's Appeal**

{¶ 180} Assignment of Error No. 1:

{¶ 181} THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S MOTION FOR A MISTRIAL.

{¶ 182} In his first assignment of error, Hall argues the trial court erred by denying his motion for a mistrial. We disagree.

{¶ 183} "A mistrial should not be ordered merely because of some error or

irregularity at trial." *State v. Pichardo-Reyes*, 12th Dist. Butler No. CA2016-09-184, 2017-Ohio-8534, ¶ 45, citing *State v. Partin*, 12th Dist. Butler No. CA2012-09-189, 2013-Ohio-2858. It is only "'when the ends of justice so require and a fair trial is no longer possible'" that a mistrial should be declared. *State v. Thacker*, 12th Dist. Warren No. CA2019-06-058, 2020-Ohio-1318, ¶ 50, quoting *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). This means, "[a] trial court should not grant a motion for a mistrial unless it appears that some error or irregularity has been injected into the proceeding that adversely affects the substantial rights of the accused, and as a result, a fair trial is no longer possible." *State v. Thornton*, 12th Dist. Clermont No. CA2008-10-092, 2009-Ohio-3685, ¶ 11, citing *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988).

{¶ 184} When reviewing a trial court's decision to grant or deny a mistrial, this court "should examine the climate and conduct of the entire trial, and grant 'great deference to the trial court's discretion * * * in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial.'" *State v. Jackson*, 12th Dist. Madison No. CA2019-03-006, 2020-Ohio-2677, ¶ 31, quoting *State v. Glover*, 35 Ohio St. 3d 18, 19 (1988). That is to say, in more simpler terms, the decision to grant or deny a mistrial lies within the trial court's sound discretion. *State v. Derifield*, 12th Dist. Madison No. CA2020-01-002, 2021-Ohio-1351, ¶ 39. To that end, this court will not disturb a trial court's decision to grant or deny a mistrial absent an abuse of that discretion. *State v. Stevens*, 12th Dist. Butler No. CA2009-01-031, 2009-Ohio-6045, ¶ 11, citing *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92; and *Thornton*, 2009-Ohio-3685 at ¶ 11.

{¶ 185} "An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable." *State v. Motz*, 12th Dist. Warren No. CA2009-10-137, 2010-Ohio-2170, ¶ 12, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160,

¶ 130. "A decision is unreasonable where a sound reasoning process does not support it." *State v. Miller*, 12th Dist. Butler No. CA2016-01-007, 2016-Ohio-7360, ¶ 7, citing *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990). "[A]n 'arbitrary' decision is one made 'without consideration of or regard for facts [or] circumstances.'" *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). "'An unconscionable decision may be defined as one that affronts the sense of justice, decency, or reasonableness.'" *State v. Wane*, 12th Dist. Butler Nos. CA2020-01-010, CA2020-01-011, CA2020-01-014, and CA2020-01-015, 2020-Ohio-4874, ¶ 22, quoting *Campbell v. 1 Spring, LLC*, 10th Dist. Franklin No. 19AP-368, 2020-Ohio-3190, ¶ 9.

{¶ 186} Because A.Z. was allowed to testify as a "victim" of Hall's alleged sexual abuse at trial, Hall argues the trial court erred by denying his motion for a mistrial given that "[e]ven the best curative instruction could not eliminate the inflammatory prejudice caused to [him]." Hall argues this must be the case given the "context" in which the jury heard A.Z.'s testimony regarding Hall's alleged "crimes" perpetrated against her. However, as discussed more fully below in Hall's second and third assignments of error, A.Z.'s testimony was otherwise admissible as "other-acts" evidence under Evid.R. 404(B) to show, at the very least, intent and the absence of mistake or accident. The trial court explained this to the jury on two separate occasions, once after the state formally rested its case-in-chief and again as part of the trial court's final jury instructions. Those jury instructions, while having the tendency to be overly broad given that they listed several irrelevant purposes for which A.Z.'s testimony could be considered, were not objected to by Hall and largely traced the model instruction provided in the Ohio Jury Instructions.

{¶ 187} Under these circumstances, and when examining the climate and conduct of the entire trial, which includes the fact that Hall's defense strategy remained the same

even after learning the charges related to his alleged sexual abuse of A.Z. would likely be dismissed at the close of the state's case-in-chief, we cannot say the trial court's decision denying Hall's motion for a mistrial was an abuse of discretion. This is because trial court's decision denying Hall's motion was not unreasonable, arbitrary, or unconscionable given the unique facts and circumstances of this case. This includes the "context" in which the jury heard A.Z.'s testimony. "The purpose of appellate review is to ensure that litigants receive fair trials, not perfect ones." *State v. Lopez*, 2d Dist. Montgomery No. 18646, 2001-Ohio-6997, 2001 Ohio App. LEXIS 5620, *16 (Dec. 14, 2001) (Fain, J., concurring). Such is the case here. Therefore, because we find no abuse of discretion in the trial court's decision denying Hall's motion for a mistrial, Hall's first assignment of error lacks merit and is overruled.

{¶ 188} Assignment of Error No. 2:

{¶ 189} THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO "OTHER-ACTS" EVIDENCE

{¶ 190} In his second assignment of error, Hall argues the trial court erred by admitting A.Z.'s testimony as "other-acts" evidence under Evid.R. 404(B). We disagree.

{¶ 191} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit [a] crime or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 251, 2012-Ohio-5695, ¶ 15. To that end, pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." That is to say, "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36. "Such evidence, however, is permitted for other

purposes, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident." *State v. Smith*, 12th Dist. Clermont No. CA2019-10-075, 2020-Ohio-4008, ¶ 50. "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

{¶ 192} A "three-part analysis" must be applied when considering the admission of other-acts evidence: (1) the evidence must be relevant under Evid.R. 401; (2) the evidence must be introduced for a purpose other than proving propensity like those permitted purposes set forth under Evid.R. 404(B); and (3) the probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice under Evid.R. 403(A). *State v. Fannin*, 12th Dist. Warren No. CA2020-03-022, 2021-Ohio-2462, ¶ 17, citing *Williams*, 2012-Ohio-5695 at ¶ 20; and *Hartman* at ¶ 22; *State v. Tunstall*, 12th Dist. Butler No. CA2019-06-090, 2020-Ohio-5124, ¶ 34-36. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Tunstall* at ¶ 35, quoting Evid.R. 401. "In the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *Smith*, 2020-Ohio-4441 at ¶ 37, citing *Hartman* at ¶ 26-27.

{¶ 193} "Courts are precluded from admitting improper character evidence under Evid.R. 404(B), but have discretion to allow other-acts evidence that is admissible for a permissible purpose." *State v. Lewis*, 9th Dist. Summit No. 29696, 2021-Ohio-1575, ¶ 9, citing *State v. Graham*, 164 Ohio St. 3d 187, 2020-Ohio-6700, ¶ 72. Thus, a mixed standard of review applies when addressing a trial court's decision regarding the admission of other-acts evidence. *State v.* Gawron, 7th Dist. Belmont No. 20 BE 0009, 2021-Ohio-3634, ¶ 40.

A de novo standard applies when determining whether the other-acts evidence was offered for a permissible, non-propensity-based purpose, whereas an abuse of discretion standard applies when determining whether the trial court erred in the exercise of its judgment by admitting the other-act evidence for that purpose. *See State v. Baker*, 12th Dist. Butler No. CA2020-08-086, 2021-Ohio-272, ¶ 27, citing *Hartman* at ¶ 22 and 30; *see also Tunstall* at ¶ 36. "While a de novo review requires this court to review the matter anew, an abuse of discretion standard requires us to determine whether the trial court's decision was unreasonable, arbitrary, or unconscionable." *Id.*, citing *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8.

{¶ 194} To support this assignment of error, Hall initially argues it was error for the trial court to admit A.Z.'s testimony as "other-acts" evidence under Evid.R. 404(B) because the state did not offer A.Z.'s testimony to prove any one of the permitted purposes set forth within that rule, i.e., to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident. However, although it is beyond dispute that the state was not offering A.Z.'s testimony as other-acts evidence when A.Z. initially took the stand, A.Z.'s trial testimony was undoubtably relevant and could have been introduced by the state at trial for at least two, if not more, of the permitted purposes set forth in Evid.R. 404(B) had the charges related to Hall's alleged sexual abuse of A.Z. never been brought. This includes, but is not necessarily limited to, to show Hall's intent and the absence of mistake or accident. "Other-acts evidence is admissible to negate a defendant's claim of mistake or accident with respect to the commission of the alleged crime; such evidence tends '[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Hartman*, 2020-Ohio-4440 at ¶ 52, quoting McCormick, *Evidence*, Section 190, 804 (4th Ed. 1994).

{¶ 195} This is necessarily the case given Hall's repeated denials to both A.Z. and

E.A. that he had done anything more than what he admitted to within State's Exhibit 1, i.e., his "confession" and "love letter to his daughters" that he provided to police during the search of his home, wherein Hall acknowledged that he had touched both A.Z. and E.A. inappropriately when they were children. This is also the case given the statement Hall made during one of the telephone calls he had with A.Z. on April 18, 2019 claiming he did not remember doing any of the things that A.Z. and E.A. were alleging, but that if he "was ever wasted and accidentally did something that is one thing." This is in addition to Hall's statements during that same April 18, 2019 telephone call, as well as Hall's May 1, 2019 telephone call with E.A., wherein Hall claimed that maybe he did not remember anything that A.Z. and E.A. were alleging because he had been sleepwalking or because he might be a paranoid schizophrenic with split personalities.

{¶ 196} Hall, therefore, did not merely deny A.Z.'s and E.A.'s allegations ever occurred. Hall also defended against A.Z.'s and E.A.'s allegations by claiming if something had happened that it was accidental, inadvertent, or unintended because he was "wasted," sleepwalking, or possibly suffering from split personalities. Accordingly, because Hall placed his intent at issue by claiming his actions were accidental, innocent, or without his knowledge, A.Z.'s testimony was properly admissible as other-acts evidence under Evid.R. 404(B) to show, at the very least, intent and the absence of mistake or accident. *See, e.g., Fannin*, 2021-Ohio-2462 at ¶ 4, 28-31 (finding "other-acts evidence related to [one child victim] was properly admissible to show intent and absence of mistake" at trial where appellant was being tried for raping another child victim and defending against the charge by claiming the rape never happened, but "if it was happening in the middle of the night, he was not aware of it"). Hall's claim otherwise lacks merit.

{¶ 197} Hall also argues it was error for the trial court to admit A.Z.'s testimony as "other-acts" evidence because, "without limiting the scope" of A.Z.'s testimony prior to her

taking the stand, A.Z.'s testimony was highly prejudicial," thereby requiring its exclusion under Evid.R. 403(A). Without question, A.Z.'s testimony was prejudicial. All evidence presented by the prosecutor is prejudicial. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107. But not all evidence *unfairly* prejudices a defendant. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 31. "Under Evid.R. 403(A), only evidence that is *unfairly* prejudicial is excludable." (Emphasis sic.) *State v. Smith*, 12th Dist. Butler No. CA2008-03-064, 2009-Ohio-5517, ¶ 60. "Unfairly prejudicial evidence is not merely unfavorable evidence; rather, it is evidence, which might result in an improper bias for a jury decision." *State v. Mills*, 12th Dist. Clermont No. CA2015-12-101, 2016-Ohio-6985, ¶ 18, citing *State v. Bowman*, 144 Ohio App.3d 179, 186 (12th Dist.2001).

{¶ 198} "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis." *Hartman*, 2020-Ohio-4440 at ¶ 30. Therefore, despite Hall's claims, when considering the trial court found it proper to admit A.Z.'s testimony as other-acts evidence, the trial court clearly determined that the probative value of A.Z.'s testimony did not substantially outweigh the danger of unfair prejudice to Hall, thereby requiring its exclusion under Evid.R. 403(A). *See* Evid.R. 403(A) ("[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury"). The trial court did not abuse its discretion in reaching this decision. That is to say, the trial court's decision finding the probative value of A.Z.'s testimony did not substantially outweigh the danger of unfair prejudice to Hall was not unreasonable, arbitrary, or unconscionable. Hall's claim otherwise again lacks merit. Accordingly, for the reasons outlined above, Hall's second assignment of error lacks merit and is overruled.

{¶ 199} Assignment of Error No. 3:

{¶ 200} THE COURT'S INSTRUCTIONS TO THE JURY ON OTHER-ACTS

EVIDENCE WAS IN ERROR.

{¶ 201}   In his third assignment of error, Hall argues the trial court's instructions it provided to the jury regarding the "other-acts" evidence, specifically, the trial court's instructions regarding the way it could consider A.Z.'s testimony, was error.

{¶ 202}   To support this assignment of error, Hall initially argues the trial court erred by failing to give the jury a limiting instruction prior to A.Z. taking the stand and testifying to the "other-acts" evidence discussed more fully above.  However, as the record indicates, the trial court was unaware that the charges related Hall's alleged sexual abuse to A.Z., Counts 1, 2, 3, 4, 5, 7, and 8, would need to be dismissed at the time when A.Z. took the stand and testified in the manner that she did.  Nobody did.  It was only after A.Z.'s testimony was complete that the trial court was able to conclusively determine that those charges were, as a matter of law, not supported by sufficient evidence given the definition of "sexual conduct" applicable to those charges did not include digital penetration.  Therefore, because it was only *after* A.Z. testified that anybody – including Hall – knew the charges related to A.Z. would need to be dismissed, the trial court had no way of knowing it would need provide the jury with a limiting instruction regarding A.Z.'s testimony *before* A.Z. ever took the stand.  Accordingly, Hall's claim alleging the trial court erred by failing to give the jury a limiting instruction regarding other-acts evidence prior to A.Z. taking the stand lacks merit.

{¶ 203}   Hall also argues the trial court erred because the instructions it provided to the jury was overbroad, confusing, and prejudicial.  Specifically, Hall takes issue with the following instruction the trial court provided to the jury after the state formally rested its case-in-chief, which provided:

> The Court has withdrawn from your consideration Counts 1, 2, 3, 4, 5, 7 and 8.  You are not to speculate as to why the Court has withdrawn them.  Evidence relating to those counts was received about the commission of other acts, other than the remaining offenses with which the Defendant is charged in this

trial, specifically the allegations made by [A.Z.], that evidence was allowed for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character in this case with the remaining charges.

If you find at the close of the case that the evidence of the other acts is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it tends to prove the Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{¶ 204} Hall also takes issue with the instruction the trial court provided to the jury as part of its final jury instructions, which, similar to the trial court's earlier instruction set forth above, provided:

Evidence was received about the commission of other acts, other than the offense with which the Defendant is not charged in this trial. Specifically, I am referring to the allegations of [A.Z.]

That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character in this case regarding the remaining counts involving [E.A.]

If you find that the evidence of other acts as alleged by [A.Z.] as true, and that the Defendant committed them, you may consider that evidence only for the purposes of deciding whether it proves the Defendant's motive, opportunity, intent or purpose, absence of mistake or accident, or preparation or plan to commit the offenses charged in this trial. That evidence cannot be considered for any other purpose.

{¶ 205} Citing the Ohio Supreme Court's decision in *Hartman*, 2020-Ohio-4440, Hall argues that the instructions the trial court provided to the jury in this case were clearly prejudicial to him. Specifically, Hall cites *Hartman* at ¶ 69-70, wherein the Ohio Supreme Court stated:

To tell a jury that a certain piece of evidence may be considered as evidence of 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' Evid.R. 404(B), imparts nothing meaningful and is akin to telling

the jurors that the evidence may be considered for any purpose.

Thus, when a court issues a limiting instruction with respect to other-acts evidence, the instruction should be tailored to the facts of the case.

{¶ 206} Unfortunately, the trial court's instructions in this case were not so tailored. However, when taken in context, that portion of the Ohio Supreme Court's decision in *Hartman* is undoubtedly dicta and clearly intended to apply prospectively to jury trials coming after that case was released. The Ohio Supreme Court specifically states as much in the next sentence noting that, "*[g]oing forward*, courts should explain, in plain language, the purposes for which the other acts may and may not be considered." (Emphasis added.) *Id.* at ¶ 70. Therefore, because the Ohio Supreme Court's decision in *Hartman* was released on September 22, 2020, which was nearly a full month after Hall's jury trial concluded, the Ohio Supreme Court's commentary in *Hartman* that, going forward, trial courts should use plain language to explain the purpose(s) that other-acts evidence may and may not be considered, could not have been applied by the trial court to the case at bar. The trial court applied the law as it existed at the time, which is all that the trial court could be expected to do.

{¶ 207} Moreover, although Hall did initially note his belief that the trial court's final jury instruction "needs to be tailored to what the State intends to offer that for," Hall did not object to the trial court's instruction on that basis. Hall instead stated, "that works" regarding the instruction the trial court provided to the jury after the state formally rested its case-in-chief, and "[n]o objection, Your Honor," when asked if he had any objection to the trial court's instruction it provided to the jury as part of its final jury instructions. Therefore, like the appellant in *Hartman*, because Hall did not object to the trial court's instructions now at issue, we decline to find plain error here. *See id.* at ¶ 72; *see, also, Tunstall*, 2020-Ohio-5124 at ¶ 57 ("[a]s the jury instruction provided in this case was also not objected to by

appellant or his counsel and the instruction was substantially similar to the model instruction set forth in the *Ohio Jury Instructions*, we conclude that the trial court's instruction did not constitute plain error"). This is particularly true here given what Hall stated during his closing argument; specifically, that the jury could consider A.Z.'s testimony for a "very limited, narrow purpose" like "opportunity" or "plan," neither of which were particularly relevant to facts of this case. Accordingly, for the reasons outlined above, Hall's third assignment of error lacks merit and is overruled.

{¶ 208} Assignment of Error No. 4.

{¶ 209} THE TRIAL COURT ERRED IN LIMITING THE DEFENDANT-APPELLANT'S CROSS-EXAMINATION OF E.A. RELATING TO A 2008 FALSE CLAIM OF RAPE.

{¶ 210} In his fourth assignment of error, Hall argues the trial court erred by limiting the extent that he could cross-examine E.A. about the 2008 incident referenced above wherein E.A. made an "unfounded" claim of rape. Specifically, Hall argues the trial court erred by refusing to allow him to conduct a "more thorough examination" of E.A. as it relates to the "fanciful claims" she made regarding that incident set forth in the 2008 police report and accompanying documentation. Hall argues this was error because it denied him the opportunity to introduce "evidence of the instability of this particular witness."

{¶ 211} However, as a simple review of the record reveals, Hall was attempting to introduce extrinsic evidence that the Ohio Supreme Court in *State v. Boggs* explicitly stated "under no circumstances" would a defendant like him be permitted to introduce at trial. *Id.*, 63 Ohio St.3d. 418, 422 (1992), citing Evid.R. 608(B) ("[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, * * * may not be proved by extrinsic evidence"). A simple review of the record also establishes that, when told of the trial court's decision prohibiting Hall from introducing

extrinsic evidence of that 2008 incident, Hall responded and noted that he was "good with that" and "satisfied" with the trial court's decision. Therefore, in light of the Ohio State Supreme Court's decision in *Boggs*, which, it should be noted, the trial court implicitly referenced several times when sustaining the state's objections to Hall's questioning of E.A. on cross-examination, the trial court did not err by limiting the extent to which Hall could cross-examine E.A. about that 2008 incident.

{¶ 212} Also in his fourth assignment of error, Hall claims, without any supporting argument, that the trial court "erroneously allowed" his "recorded statements to be played to the jury" including "one where [he] bolstered A.Z.'s credibility." This is in addition to Hall's claim, again without any supporting argument, that the trial court erred by admitting into evidence "the testimony of the detective in A.Z.'s case," Detective Dunkel, as well as State's Exhibits 9, 10, 14 thru 17, 20, 26 thru 28, 43, 44, 51, and 55. However, as permitted by App.R. 12(A)(2), we decline to review these arguments due to a lack of briefing as required by 16(A)(7). *See, e.g., State v. Holtman*, 12th Dist. Clermont No. CA2018-11-078, 2019-Ohio-3052, ¶ 35. But, even if we were to address Hall's claims on the merits, the record indicates that a plain error standard of review would apply to most, if not all, of these issues given that Hall either failed to object entirely or failed to object on the specific ground that he is now attempting to raise on appeal. *See, generally, State v. Young*, 12th Dist. Butler No. CA2020-04-052, 2021-Ohio-2541, ¶ 71 ("[w]hen a defendant fails to object, or fails to object at trial on the specific ground raised on appeal, the reviewing court is limited to a plain-error analysis"). Accordingly, Hall's fourth assignment of error lacks merit and is overruled.

{¶ 213} Assignment of Error No. 5:

{¶ 214} THE COURT ERRED WHEN IT OVERRULED DEFENDANT'S MOTION TO SEVER THE INDIVIDUAL COUNTS OF THE INDICTMENT.

{¶ 215} In his fifth assignment of error, Hall argues the trial court erred by denying his motion to sever the charges set forth in the indictment related to A.Z. from those related to E.A. We disagree.

{¶ 216} Pursuant to Crim.R. 8(A), two or more offenses may be charged in the same indictment if the offenses charged are: (1) of the same or similar character; (2) based on the same act or transaction; (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan; or (4) part of a course of criminal conduct. The law favors joining multiple offenses in a single trial. *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 78, citing *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). The joinder of offenses is, in fact, to be liberally permitted in circumstances where the requirements set forth in Crim.R. 8(A) are satisfied. *State v. Wilson*, 12th Dist. Clermont No. CA2001-09-072, 2002-Ohio-4709, ¶ 49. This is because the joinder of offenses "conserve[s] judicial resources, reduce[s] the chance of incongruous results in successive trials, and diminish[es] inconvenience to the witnesses.'" *State v. Addison*, 12th Dist. Clermont Nos. CA2019-07-058 and CA2019-07-059, 2020-Ohio-3500, ¶ 49, quoting *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). "Nonetheless, pursuant to Crim.R. 14, if it appears that the defendant would be prejudiced by joinder of the charged offenses, the trial court may grant a severance." *State v. Morsie*, 12th Dist. Warren No. CA2012-07-064, 2014-Ohio-172, ¶ 28, citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 95.

{¶ 217} "The defendant bears the burden of proving prejudicial joinder." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 31. Once the defendant satisfies this burden, the state may then rebut the defendant's claim of prejudicial joinder by utilizing one of two methods. *State v. Ashcraft*, 12th Dist. No. Butler CA2008-12-305, 2009-Ohio-5281, ¶ 16. The first method, which is termed the "other acts test," requires the state to demonstrate that it could have introduced evidence of the joined offenses at

separate trials pursuant to the "other-acts" provision found in Evid.R. 404(B). *State v. Hensley*, 12th Dist. Warren No. CA2009-11-156, 2010-Ohio-3822, ¶ 40. The second method, which is termed the "joinder test," requires the state to demonstrate that evidence of each crime joined at trial is "simple and direct." *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 38. "A showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 12th Dist. Clermont No. CA2008-10-098, 2009-Ohio-4672, ¶ 53. "[A]n accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 218} The decision to grant or deny a motion to sever is a matter in the trial court's discretion. *State v. Grevious*, 12th Dist. Butler No. CA2018-05-093, 2019-Ohio-1932, ¶ 25. We review a trial court's decision to grant or deny a motion to sever under an abuse of discretion standard. *State v. Workman*, 12th Dist. Clermont Nos. CA2016-12-082 and CA2016-12-083, 2017-Ohio-8638, ¶ 74. The trial court did not abuse its discretion by denying Hall's motion to sever the charges set forth in the indictment related to A.Z. from those related to E.A. This is because, as discussed more fully above in Hall's second assignment of error, the evidence of the joined offenses could have been introduced by the state at separate trials given the evidence's admissibility as "other-acts" evidence pursuant to Evid.R. 404(B). This is also because, as the lengthy recitation of facts indicate, the evidence related to each alleged crime, and to each purported victim, A.Z. and E.A., was simple and direct. Therefore, for these reasons, Hall's fifth assignment of error lacks merit and is overruled.

{¶ 219} Assignment of Error No. 6:

{¶ 220} THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-

APPELLANT ACCESS TO GRAND JURY TRANSCRIPTS IN A TIMELY MANNER FOR A.Z. AND E.A.

{¶ 221} In his sixth assignment of error, Hall argues the trial court erred by not granting him "timely" access to grand jury transcripts regarding the allegations made against him by A.Z.[6] We disagree.

{¶ 222} "In general, proceedings before a grand jury are secret." *State v. Dougherty*, 12th Dist. Butler Nos. CA2010-02-036 and CA2010-02-037, 2011-Ohio-788, ¶ 76. The disclosure of grand jury testimony is controlled by Crim.R. 6(E). *State v. Stojetz*, 84 Ohio St.3d 452, 459 (1999). Specifically, Crim.R. 6(E) provides, in pertinent part, the following:

> A grand juror, prosecuting attorney, interpreter, court reporter, or typist who transcribes recorded testimony, may disclose other matters occurring before the grand jury, only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

{¶ 223} "[A] defendant has no right to inspect grand jury transcripts either before or during trial unless the 'ends of justice require it and there is a showing by the defense that a particularized need for the disclosure exists which outweighs the need for secrecy.'" *State v. O'Leary*, 12th Dist. Butler No. CA2013-01-009, 2013-Ohio-5670, ¶ 33, quoting *State v. Greer*, 66 Ohio St.2d 139 (1982), paragraph two of the syllabus. "A particularized need is established when the circumstances reveal a probability that 'the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue

---

6. We note that, within his sixth assignment of error, Hall also argues the trial court erred by denying him access to the grand jury transcript regarding the allegations made against him by E.A. However, except for a brief mention within his appellate brief noting the trial court "never released the Grand Jury transcript of E.A.," Hall does not present any argument to support his claim as it relates to E.A.'s grand jury testimony. Therefore, in accordance with App.R. 12(A)(2) and 16(A)(7), we will limit our review of Hall's sixth assignment of error to A.Z.'s grand jury testimony only.

by the witness' trial testimony.'" *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 153, quoting *Greer* at paragraph three of the syllabus. "The determination of whether the accused has shown the requisite 'particularized need' is a matter left to the trial court's discretion." *State v. Myers*, 12th Dist. Clinton Nos. CA2014-02-002 and CA2014-02-004, 2015-Ohio-160, ¶ 31. "Accordingly, '[a] decision denying the release of the grand jury transcript will not be reversed absent an abuse of discretion.'" *State v. Alhashimi*, 12th Dist. Warren Nos. CA2016-07-065 and CA2017-07-066, 2017-Ohio-7658, ¶ 17, quoting *Widmer* at ¶ 154.

{¶ 224} Hall argues the trial court erred by failing to give him access to A.Z.'s grand jury testimony before trial because "it would have been abundantly clear in reviewing the transcript" that "only digital penetration was alleged" by A.Z. before the grand jury, thereby necessitating the charges related to his alleged sexual abuse of A.Z., Counts 1, 2, 3, 4, 5, 7, and 8, being dismissed before trial since the definition of "sexual conduct" applicable to those charges did not include digital penetration.

{¶ 225} However, just like the trial court, we have also reviewed A.Z.'s grand jury testimony and disagree with Hall's claims that it was "abundantly clear" that A.Z.'s allegations included nothing more than digital penetration. We, in fact, believe it was not clear at all given that A.Z. explicitly testified before the grand jury – on three separate occasions – that she did not "specifically recall" if Hall had penetrated her vagina with his hand, his fingers, his penis, or with "something else." Therefore, given A.Z.'s grand jury testimony, it was not an abuse of discretion for the trial court to deny Hall access to A.Z.'s grand jury testimony before trial, nor do we believe Hall was denied a fair trial given the trial court's failure to provide him with a transcript of A.Z.'s grand jury testimony prior to when it did. This is because, as discussed more fully above under Hall's second assignment of error, A.Z.'s testimony would have still been admissible as "other-acts" evidence under

Evid.R. 404(B).  Accordingly, Hall's sixth assignment of error lacks merit and is overruled.

**{¶ 226}**   Judgment affirmed.


HENDRICKSON and BYRNE, JJ., concur.